RICHARD D. FULLER ET UX. *v.* ALEXANDER B. HORVATH ET AL.

[No. 1222, September Term, 1978.]

*Decided June 12, 1979.*

The cause was argued before MOYLAN, LOWE and COUCH, JJ.

*Alfred L. Scanlan* and *Richard J. Leamy, Jr.,* with whom were *William J. Harte* and *Shea & Gardner* on the brief, for appellants.

*Thomas H. Carolan* for appellees.

LOWE, J., delivered the opinion of the Court.

Appellants (Richard D. Fuller and wife) filed suit in the Circuit Court for Montgomery County against Midami Corporation and several named defendants (who were officers and directors or shareholders of Midami — and are appellees herein), individually, for breach of contract and fraud. They alleged that two of the individuals, on behalf of the remaining defendants (including Midami), promised to pay the appellants a fee for procuring a buyer for Midami's subsidiary, Mid Atlantic Corporation. This fee was to be in the form of forgiveness of the appellants' promissory note, held originally by Mid Atlantic and transferred to Midami. At the close of appellants' case below, the trial court directed a verdict for all defendants. The court assumed and conceded establishment of appellants' causes of action but found that individual officers or directors of a corporation, as a matter of law, cannot be held personally liable for acts performed in the scope of their authority. The court further found that no agent of Midami Corporation was a party to the breached contract.

The first contention of appellants, who were plaintiffs below, provides a considerable dilemma. While the thrust of the appeal is that the judge erred in directing a verdict, the trial record is deficient in that regard. The only entry relevant thereto is the comment of counsel for appellees that he would

" . . . like to make a short motion."

This was on the last page of the trial transcript prior to jury withdrawal and a short recess. It is followed by a concluding reporter's note:

"Whereupon, motion for directed verdict was *denied.*" (emphasis added).

The record indicates that appellants moved this Court to correct the omission in the record pursuant to Md. Rule 1027 b. In denying that motion, we learned that that which intervened between the request "to make a short motion" and

the reporter's concluding note was unavailable through no fault of either party. See Md. Rule 1025 c. The post trial record reveals that the original stenographic notes of the entire proceeding following the recess, which related to the motion for a directed verdict, have been lost. Our review further indicates that the reporter's entry in the record that the motion for directed verdict had been "denied" was in error. The docket entries and all of the post trial proceedings conducted before the judge who had decided the directed verdict motion, indicate that the motion was "granted." Indeed, this entire appeal is predicated upon that presumption. In *Shade v. State,* 18 Md. App. 407, 410-411 (1973), we stated that "[t]he transcript of the trial, *unless shown to be in error,* takes precedence over the docket entries, *see Williams v. State,* 7 Md. App. 241, 254 A. 2d 376 (1969), which are presumably made at a later point in time than the taking of a simultaneous transcript." (footnote omitted and emphasis added). The cases dealing with a variance between a transcript and a docket entry have involved clearly erroneous docket entries, *see Williams v. State, supra; Crowe v. Houseworth,* 19 Md. App. 688, 693 (1974), *rev'd on other grounds,* 272 Md. 481, 483 (1974) (following 19 Md. App. at 693 on variance question); or an ambiguous transcript and a docket entry, *see Shade v. State, supra.* In *Coleman v. State,* 231 Md. 220 (1963), the clerk entered a sentence in the docket that varied from that clearly given at trial, as verified by the transcript. The Court of Appeals stated:

> "[T]his Court has held that a docket entry must be taken as true until corrected, and the proper court to correct an erroneous docket entry is the court in which the error occurred." *Id.* at 222-223 (citations omitted).

In the present case, the trial judge noted at the post trial proceeding that he had granted the motion for a directed verdict; his comments show that the stenographer's notation at the prior proceeding was clearly in error. The docket entries stand as correct; the judge granted the defendants' directed verdict motion.

Appellants filed, and personally argued, four post trial motions for new trial at a single hearing. The last filed, but first argued, concerned the lost record of the directed verdict motion, argument and opinion. The trial judge indicated that the unavailability of the record was not a ground for a new trial because an appeal court is concerned only with facts and testimony:

> "What I have to say no one pays much attention to anyway."

To this observation, Mr. Fuller hastily dissented, stating precipitately,

> "I do."

Well so do we, Mr. Fuller! Appellant points up his own attention to the judge by attacking upon appeal both the legal premise and the factual foundation of the reasons supplied by the trial judge whose succeeding colloquy with appellant fulfilled his promise to the court reporter, that if the stenographic notes were not found, his honor would put his reasons "back into the record" at the time of the hearing on motion for new trial, "or file a memorandum or opinion for the purposes of appeal." The last two options were not taken. We must look then to his reasons as expressed for denying the motion for a new trial.

The post trial hearing record indicates that the judge's reason for having granted the motion for directed verdict in favor of Midami and the individual defendants had been a release by Mr. Fuller of the individual directors of Mid Atlantic, and that the evidence did not indicate that an officer or director of Midami had agreed to the mortgage release as compensation for the sale.

> "The question is what was the basis for the directed verdict, and the basis for my directed verdict at the conclusion of all of the testimony on behalf of the plaintiff was that in the plaintiff's case in chief there was the agreement filed, a release of Mid-Atlantic and all its directors, stockholders, heirs,

and assigns reserving, however, any right of action against Midami Corporation.

And then as all of the testimony came in as to which one of the individuals that you had any contact or relations with and that were called to testify as to who may have been an officer or director of Midami Corporation so as to represent them, there wasn't any testimony that any of the officers or directors of Midami Corporation ever made any of the representations or agreements that you had alleged."

The release upon which the court relied to relieve the individuals who had been officers or directors of Mid Atlantic was not a blanket release, however, and expressly applied only to what transpired *after* the settlement date of the purchase of Mid Atlantic by the Old Republic Insurance Company from Midami.[1] Presumably, realizing this oversight at trial, the judge set forth alternate reasons. He held that:

1. Mid Atlantic had been released

"Consequently, my decision in granting the directed verdict was based upon the fact that all of your evidence taken in the light most favorable to you disclosed an agreement between the officers of Mid-Atlantic Corporation and that you had released Mid-Atlantic Corporation.",

and that Midami was uncommitted by anyone.

"Therefore, the suit against Midami Corporation — there was no evidence whatsoever that any of their officers, directors, or anyone in authority to bind Midami Corporation had, in fact, in any way authorized the release of that indebtedness; that, in fact, the indebtedness was to Mid-Atlantic Corporation even though the note subsequently became transferred to Midami Corporation and

1. The release was signed by Mr. Fuller only. The court did not consider what effect his release would have had on Mrs. Fuller's right to sue Mid Atlantic as a third party beneficiary of the alleged contract.

assuming Midami Corporation is the one to bring suit on, or will proceed on it.

Finding that there had been no representations made by anybody, that the plaintiff established, that was authorized to act on behalf of Midami Corporation, there was no basis for the suit against Midami Corporation, and since that is a matter that can be done on the record based on the evidence, the fact that my specific statements or.holdings or any colloquy between counsel are not preserved for the record would be no different if then had I, after argument of counsel, taken the matter under advisement and then merely filed an opinion in the first place. The result would have been the same."

2. The individuals named were shielded from liability as corporate directors and officers of Mid Atlantic.

"No. The question is Mid-Atlantic. I granted the motion for a directed verdict as to each of the individuals because the evidence established that at all times they were acting on behalf of the corporation. Therefore they're not personally liable which I seem to have some difficulty getting you to understand that that's the purpose of corporations.

. . .

The purpose of corporations, Mr. Fuller, the reason people incorporate is so they won't have any personal liability."

3. Finally, the court again found that there was no evidence that Midami was committed by any "officers, directors or agents of Midami Corporation," and the judge therefore had granted the directed verdict.

"But in December when you released Mid-Atlantic you therefore released the only entity still left upon which you can sue. So, Mid-Atlantic is no longer — was never a party to this suit. It was released. I directed the verdict against the individuals. It leaves only Midami and then we get as the reasons I've

already stated that all of the actions were by officers and directors of Mid-Atlantic Corporation. There was no testimony that any of the individuals that discussed with you or authorized allegedly the payment of the fee were at any time officers, directors or agents of Midami Corporation, but only Mid-Atlantic. Therefore, Midami Corporation must also be let out even though they weren't released. So it makes no difference at all for what period of time your release to any of the individuals runs, you prove no case against them as individuals, and you've released Mid-Atlantic."

The judge's prior observation that upon review it is the facts and testimony we look to was correct; however, we do attend his own views in so doing, and find them of utmost assistance when seeking to review the legal and factual propriety of the directed verdict. Factually, for purposes of a directed verdict, we view the evidence in a light most favorable to the appellants, observing any and all legitimate inferences therefrom in their favor, unless there is but one inference permissible, *Impala Platinum v. Impala Sales,* 283 Md. 296, 327 (1978), and that unfavorable to them. Evidence, "however slight," from which the facts in issue may be rationally inferred will require a jury determination, and all conflicts in the evidence must be resolved, if legitimately deducible, as supportive of appellants' contention. *Impala Platinum v. Impala Sales,* 283 Md. at 328-329; *Gleason v. Jack Alan Enterprises,* 36 Md. App. 562, 565 (1977).

When our review discloses an evidentiary insufficiency that supports a directed verdict, our opinion can be factually brief. We need but point to the omitted evidentiary prerequisite in light of authority requiring such proof. When our review differs with a lower court's verdict, directed upon motion, then rather than simply so state, it has been our custom to review that evidence from which we believe sufficient inferences may have been drawn to warrant a factfinder's determination. The relevant evidence, synopsized in a light most favorable to appellants, was as follows:

Midami Corporation was a shell corporation holding, as its only asset, all of the outstanding stock of Mid Atlantic Corporation. The individual defendants served varying roles as officers, directors and shareholders of both Midami and Mid Atlantic Corporations. For purposes here, the two in the foreground were David Herndon who was counsel for both Midami and Mid Atlantic and had served as secretary at meetings of both corporations, and Daniel Donohoe, a director and shareholder of Mid Atlantic and a Midami shareholder. Others included Alexander Horvath, a director of Mid Atlantic Corporation and a shareholder of Midami; Gerald Cassidy, a director of Midami and a director and officer of Mid Atlantic; William Farris, a director and shareholder of Mid Atlantic and a director and shareholder of Midami Corporation; Francis A. Murray, Sr., at one time chairman of the board of Mid Atlantic and on the board of Midami Corporation; F. Alden Murray, Jr., chairman of the board of directors and president of Midami and Mid Atlantic; E. Kendall Lorenz, a shareholder of Midami and a director and shareholder of Mid Atlantic; and Guy T. Steuart, a director of Midami and a director of Mid Atlantic. The testimony of some of the above individuals evinced general confusion as to their exact capacities relative to the two corporations. We set their position forth based on our gleanings from the record extract as a whole.

Appellant, Richard D. Fuller, was first hired by Mid Atlantic Corporation as a consultant and became executive vice president and chief operating officer of Mid Atlantic in June of 1974. After ascending to the presidency, he eventually left its employ on December 30, 1975. During his tenure there, Mid Atlantic had provided him and his wife with a mortgage loan on their home in return for their $25,000 promissory note. While appellant was still president of Mid Atlantic, an executive sales committee was formed with him as a member for the purpose of effecting a sale of the corporation.

After his termination from Mid Atlantic in December of 1975, appellant was contacted by Messrs. Herndon, Horvath, and Cassidy. Appellant advised Mr. Herndon (who was attorney for, and had acted as secretary of, both Midami and

Mid Atlantic) that he might be able to effect a sale of Mid Atlantic to a group of investors in New York or the Old Republic Ins. Co. Appellant advised Mr. Herndon that he would do so for a five percent commission. Herndon rejected this offer, but contacted appellant again in March of 1976. as did Alden Murray, Jr., Midami's board chairman (who incidentally subsequently supplied financial data to Fuller for the prospective buyer). Herndon inquired whether Mr. Fuller would approach Old Republic and see if they were still interested. Herndon advised him that if he could effect a sale, his note, still held by the Corporation, would be forgiven. Herndon said they wanted a "cash for cash" deal plus a cash bonus. He reiterated that appellants' note would be forgiven as his fee for procuring Old Republic as purchaser. Appellant immediately undertook efforts to effect such a sale, but the sale fell through in April of 1976.

Appellant continued, through May, June and August of 1976, to have "continuous" contact with Herndon, sometimes twice a week, discussing the sale of Mid Atlantic and related problems. Appellant concluded a feasibility study for Old Republic in May of 1976. During this period, Mr. Fuller entered into a ten week consultant contract with Old Republic. After his contract expired, he continued being paid on a week-to-week basis as a consultant, until June of 1976, and remained in contact with representatives of Mid Atlantic with regard to sale of the corporation.

At this time, Donohoe was one of the "trustees" of the Fuller note. Donohoe advised Fuller that he had discussed the matter with the other individual defendants and that the "same deal" applied, that is, if Fuller could procure a purchaser for Mid Atlantic's assets, his note would be forgiven.

Fuller again contacted Old Republic concerning the sale and prepared several memoranda addressed to Old Republic personnel specifically outlining the advantages of the sale. Fuller continued to believe that his note would be forgiven.

Old Republic again contacted appellant and requested a complete financial picture of Mid Atlantic. Appellant contacted Donohoe, advising him of this request. Donohoe

and Lorenz provided appellant with all the financial figures needed. These figures formed the basis of a second memorandum from appellant to Old Republic regarding the sale. Fuller was in "daily" contact with officers of Old Republic and with Herndon and Donohoe, pushing the sale.

On the first of September, 1976, Old Republic tentatively agreed to buy Mid Atlantic. Appellant contacted Herndon and advised him that the deal was set as negotiated, *i.e.,* cash for cash, but as previously agreed, they would be unable to acquire any "bonus" over and above "cash for cash." Herndon advised that he needed confirmation from Old Republic. Appellant provided confirmation from Old Republic, then helped draft Old Republic's letter of intent, dated September 3, 1976. He continued to understand that his fee would be forgiveness of the note held by Mid Atlantic.

The note had not been included in the assets to be sold to Old Republic; thus, on September 9, 1976, appellee Murray, Jr. contacted Old Republic and sought to have Fuller's note included in the assets being purchased by Old Republic. This idea was rejected by Old Republic.

Old Republic's purchase offer was accepted by Mid Atlantic at the end of September and was closed on December 10, 1976. Up until this time, there had been no suggestion by any of the defendants that appellant's fee was to be renounced. After the letter of intent sent by Old Republic on September 3, 1976, appellant ceased making payments on the note. No payment for September, October, November or December had been made. The payments were due by the 9th of each month. None of the appellees raised any question as to the delinquency.

On December 9, 1976, appellant was told by Herndon and Donohoe that he was to receive no fee. All of the defendants had been aware of the arrangements for appellant's fee.

Appellant was present at the closing on December 10, 1976, and he was "mad as hell" about the apparent renunciation of his fee. Mr. Chapman of Old Republic took him aside and advised that the sale would fall through unless Fuller would release Old Republic from any liability. Fuller agreed to do

so and executed a release typed up at that time by Herndon and Chapman.

> "In connection with the Closing today of the purchase by Old Republic of all of the outstanding stock of Mid Atlantic from MIDAMI CORPORATION, this will confirm to you that the release executed by me dated December 30, 1975, a copy of which is attached hereto as Exhibit A, is still in full force and effect as regards Mid Atlantic, and I hereby agree to the release and discharge of Mid Atlantic, its successors and assigns, and its Officers and Directors in office from and after the Closing today, and covenant not to sue any of said persons, as to any matters pertaining to my employment by or other relationship with Mid Atlantic prior to the Closing.

> Notwithstanding this letter, I hereby reserve any and all rights which I may have with respect to the attached release or otherwise against MIDAMI CORPORATION, its Directors and Officers, their respective successors and assigns and any other person except Mid Atlantic, its successors and assigns and its Officers and Directors from and after the Closing as aforesaid."

As can be seen, the release released those who were *to become* officers and directors of Mid Atlantic after the December 10th closing, *i.e.,* Old Republic. The release did not release the individual defendants or Midami Corporation.[2] On December 10, 1976, the day of settlement, appellant received a letter from Murray, Jr. who was present at the closing. That letter advised appellant that he was delinquent on his note, and that the note had been transferred to Midami Corporation.

---

2. The prior release confirmed by reference in the December 10, 1976 document was offered and filed at the post trial motion hearing but was not evidence before the court at the trial. On its face, it appeared to release the directors/officers of Mid Atlantic *only* as to causes of action accruing *prior* to December 30, *1975,* the date of Mr. Fuller's termination from Mid Atlantic.

In the offices that housed both Mid Atlantic and Midami Corporations, a collective meeting of Midami's board of directors, shareholders and Mid Atlantic directors (who were substantially the same persons), was held on December 2, 1976, and the Fullers' note was transferred from Mid Atlantic Corporation to Midami Corporation, in the trust of Herndon and Murray, Jr. Then the individual appellees, acting as the stockholders of Midami, reflect in the minutes an admission of a prior obligation or agreement but deny that appellant had performed.

> "An extended discussion was held concerning the status of Mr. Fuller's obligation. It was the consensus of the meeting that Mr. Fuller remains fully obligated on this note, and that Mr. Fuller was not in any way responsible for the proposed sale of Mid Atlantic Mortgage Insurance, Inc. to Old Republic Insurance Company.
>
> Mr. Donohoe and Mr. Johnson advised the stockholders of their discussions with Mr. Fuller indicating a different interpretation on his part. The consensus of the meeting was that the representatives should not forgive any of Mr. Fuller's obligation, but, if necessary to complete the transaction, were authorized to negotiate with Mr. Fuller to the total amount of his obligation to the Corporation."

Much of the testimony, which was given primarily by appellant, was supported in part by that of other witnesses, including individual appellees themselves. For example: Herndon, in his testimony, conceded that Fuller was to receive a fee but took issue with the conditions precedent; Herndon corroborated appellant's testimony that Donohoe went to the appellees and raised the question of paying appellant a fee for procuring a buyer; Herndon also testified that he personally asked Donohoe to come to the meeting of December 2, 1976, to discuss appellant's fee; Herndon suggested to the directors that Fuller be contacted regarding the sale of the company; Donohoe and Lorenz confirmed

appellant's testimony that they provided him with all the financial figures necessary to make his presentation to Old Republic; Murray, Jr., the chairman and president of both Mid Atlantic and Midami testified that he knew appellant had not paid on his note for three months (September, October, November). He admitted that, in his mind, there was a correlation between the suspension of payments and appellant's claim to a fee, yet he did nothing until the sale was consummated. On the date of closing, he advised appellants of their delinquency; and the Midami minutes themselves implicitly admit some form of agreement but denied compliance with its conditions by appellant.

In explaining our holding, it is prefatorily important to note that appellants' declaration alleged fraud as well as breach of contract:

> "The allegations of fact hereinabove set forth are incorporated herein and made a part hereof, and further,
>
> Plaintiffs believe, and therefore aver, that in March of 1976, when defendant MIDAMI Corporation made its offer to plaintiff Richard D. Fuller, and afterwards, defendant MIDAMI's officers, directors, and agents Gerald K. Cassidy, William S. Farris, Sheldon Magazine, Francis A. Murray, Sr., F. Alden Murray, Jr., Daniel T. Donohoe, Alexander B. Horvath, E. Kendall Lorenz, Guy T. Steuart, and David L. Herndon never intended to honor that offer, and moreover agreed and conspired amongst themselves to conceal their true intentions from the plaintiffs, so as to fraudulently induce plaintiff Richard D. Fuller to expend the great amount of time, energy, and expertise needed to arrange the purchase of Mid Atlantic by Old Republic, and to thus unjustly enrich themselves at the expense of the plaintiffs. In furtherance of this fraudulent intention, the said defendants knowingly permitted plaintiffs to cease their payments under the Second Trust, without

protest, luring them along until the sale of Mid Atlantic had been accomplished."

Had that not been so, or had there been no facts sufficient from which an inference of fraud could be inferred, the trial judge would have been correct in holding that the individual defendants were protected by a corporate veil. However. there is an exception to the personal liability protection of corporate officers, directors and shareholders that the judge missed here, which provides a chink in such corporate armor. When officers, directors or shareholders have participated in fraudulent schemes, their individual liability may be exposed.

"It will suffice to reflect that a corporation will be regarded as an independent person, Brune, *Maryland Corporation Law and Practice,* § 371 (rev. ed. 1953), and its shareholders will not be held personally liable for the debts or other obligations of the corporation except where necessary to prevent fraud or to enforce a paramount equity. *Damazo v. Wahby,* 259 Md. 627, 633. A similar rule provides that the corporate veil protects officers and directors from personal liability. *Cf. A. B. Corporation v. Futrovsky,* 259 Md. 65, 79; *Ace Development Co. v. Harrison,* 196 Md. 357. 366-367; *Ex Parte Garey,* 202 Md. 11, 17." *Rosenbloom v. Electric Motor Repair,* 31 Md. App. 711, 720 (1976).

*See also Bart Arconti & Sons v. Ames-Ennis,* 275 Md. 295 310-311 (1975):

"Although a number of variations upon the same theme may be found, the most frequently enunciated rule in Maryland is that although the courts will, in a proper case, disregard the corporate entity and deal with substance rather than form, as though a corporation did not exist, *Md. Trust Co. v. Tulip Realty,* 220 Md. 399, 414, 153 A. 2d 275 (1959), shareholders generally are not held individually liable for debts or obligations of a corporation except where it is necessary to prevent fraud or enforce a paramount equity. *Damazo v. Wahby,* 259 Md. 627,

633, 270 A. 2d 814 (1970); *see Gordon v. SS Vedalin,* 346 F. Supp. 1178, 1181 (D.C. Md. 1972)."

This is so even though such fraudulent action was conducted in furtherance of corporate business. 37 Am.Jur.2d *Fraud and Deceit* § 322. *Ace Development Co. v. Harrison,* 196 Md. at 366-367.

Fraud is a scienter tort consisting of the representation of a material fact that is false, deceptive and injurious. 37 C.J.S. *Fraud* § 3. Although fraudulent intent is a necessary element, *Lamm v. Port Deposit Homestead Association, &c.,* 49 Md. 233 (1878), a legal inference of fraud is permissible from the conduct of the parties, without regard to their intent. *Sisk, et al. v. Garey,* 27 Md. 401 (1867). Fraud is not a single fact but a conclusion to be drawn from all of the circumstances of the case. *Brogden v. Walker's Ex'r.,* 2 H. & J. 285 (1805); *Green v. Lombard,* 28 Md. App. 1, 12 (1975), *cert. denied,* 276 Md. 743 (1975).

While a jury should be apprised that something more than a mere preponderance of the evidence of fraud should be produced, *Rent-A-Car Co. v. Fire Ins. Co.,* 161 Md. 249, 268 (1931), *i.e.,* the evidence must show *clearly and satisfactorily* the fraudulent participation, *Loyola Fed. S. & L. v. Trenchcraft,* 17 Md. App. 646 (1973), those standards are for the ultimate factfinding. All that is necessary at the directed verdict stage, despite the high ultimate standard, is that there be some competent evidence "however slight". *Impala Platinum v. Impala Sales,* 283 Md. at 323, 328-329. *But see Dixon v. Process Corp.,* 38 Md. App. 644 (1978).[3]

The facts are such in this case that a strong inference of fraud was available to a factfinder. The individual defendants first acquiesced in the agreement, permitted Fuller to believe until the end that he had complied, and then, upon renouncing the agreement, sought to avoid complications and still profit

___

3. In Impala, the Court of Appeals reviewed the correctness of the denial of a directed verdict motion to a count of fraud, using the standard we have set forth. In Dixon, this Court discussed a motion to dismiss a charge based on fraud in terms of clear and satisfactory proof. However, the Court had already noted that the judge below had expressly found that not even a modicum of evidence existed to support a finding of fraud, regardless of the standard used.

from the scheme by offering the note for a bargain sale to Old Republic. Upon being refused, they transferred it from Mid Atlantic which was sold, to Midami which they owned and changed trustees in the doing. Inferentially this conduct carried the appearance of fraudulently using and profiting by appellant's services, with every intention from the inception of the agreement to avoid their obligation to him upon his noncompliance with the agreement. Whether such conduct, circumstantially proved, was fraudulent is a factfinder's question, but the inference was available within appellant's evidentiary collage. *Brogden v. Walker's Ex'r, supra; Green v. Lombard, supra.*

It could follow that neither the corporate veil of Mid Atlantic which was not a party, nor that of Midami which was, is available as a matter of law to the individuals in this case, who served reciprocally between the two corporations and met simultaneously in regard to the subject matter of the suit. Such conduct is of itself suspect absent explanation.

Furthermore, as regards Midami, Herndon's partially admitted contractual agreement inferentially could have been on behalf of either corporation as he was attorney and had acted as secretary to both, or indeed more likely on behalf of both, considering the wholly owned interwoven relationship of the one by the other. Additionally, Herndon's second contact was made with, or soon followed by, Alden Murray, Jr., who had also served dually as president and board chairman of *both* corporations.

> "The appointment of an agent for a corporate principal, as for an individual principal, need not be in writing, and may be presumed or inferred from circumstances. The powers of corporate agents and the scope of their authority also depend on the same principles as in the case of agents for individuals. In general an agent who has been 'held out' as possessing certain powers is authorized to exercise such powers." Brune, *Maryland Corporation Law and Practice,* § 233 (rev. ed. 1953).

Midami then, was inferentially committed to the contract by

Herndon and Murray (as well as Donohoe) and the inferentially fraudulent conduct of the individual appellees was sufficiently evident to sustain a verdict against Midami as well as themselves, by a reasonable factfinder in the absence of any explanation or defense of the conduct.

Individually, the evidentiary implications warranting submission to a jury were substantially greater as to Herndon, Murray and Donohoe than to the others. The remaining individual appellees are implicitly tied in by the testimony of their ratification of Herndon's agreement to solicit appellant's services, and their subsequent renunciation as reflected by the testimony and corporate minutes. But these are matters of weight of the evidence, just as will be appellants' credibility when contrasted by appellees' defense. That is precisely what the jury should have been permitted to decide. The primary error of the court below was in overlooking the allegations of fraud and its effect upon the individuals cloistered behind the corporate entities.

Unfortunately, appellees addressed the issues raised by appellants as if defending a verdict in their favor by a factfinder on a sufficiency of the evidence basis. But, as we pointed out, that is not the question; it is quite the reverse. The issue here is not what was in the record favorable to appellees, but rather had appellants produced enough evidence, even to warrant a factual determination. We hold that appellants did. But it should be made clear that is all we hold! Our opinion should not reflect a factual preference, especially when all the facts are not in.

*Judgment reversed.*
*Case remanded for retrial.*
*Costs to be paid by the appellees.*