748 A.2d 48

**TRICAT INDUSTRIES, INC., et al.**

v.

**Paul E. HARPER.**

**No. 742, Sept. Term, 1999.**

Court of Special Appeals of Maryland.

March 10, 2000.

90

Julie C. Janofsky (David M. Wyand and Brocato, Price & Bushel, P.A., on the brief), Baltimore, for appellants.

Charles M. Kerr (Kerr McDonald, LLP, on the brief), Baltimore, for appellee.

Argued before EYLER, THIEME and SONNER, JJ.

EYLER, Judge.

Paul E. Harper, appellee, filed suit in the Circuit Court for Baltimore City against Tricat Industries, Inc. (Tricat) and KataLeuna GmbH (KataLeuna), appellants, for breach of an employment agreement. Appellants appeal from a jury ver-

dict and resulting judgment in favor of appellee and contend that the circuit court committed several legal errors. Appellee has filed a cross-appeal, contending that he was entitled to pre-judgment interest. For the reasons that follow, we shall reverse and remand for a new trial.

## Facts

Tricat is an Oklahoma corporation with its principal place of business in Baltimore County. KataLeuna is a German corporation with its principal place of business in Leuna, Germany. KataLeuna is a partially owned subsidiary of Tricat Management GmbH (Tricat Management), which is a wholly owned subsidiary of Tricat Europe S.A., which is a wholly owned subsidiary of Tricat.

In January, 1996, Dr. P. Kenerick Maher, President of Tricat, contacted appellee to see if he would be interested in serving as chief financial officer of Tricat and its affiliated companies. On February 9, 1996, as "President" of Tricat and "Chairman" of KataLeuna, Dr. Maher extended a written offer to appellee for the position of senior vice president and chief financial officer of Tricat and executive vice president and supervising financial officer of KataLeuna. Appellee was to be compensated at the rate of $120,000 per year, with adjustments "if circumstances justify." Appellee accepted the offer the same day.

The agreement dated February 9, 1996, also provided (1) that appellee would be provided with housing and a car in Germany, (2) the standard family medical insurance and 401-K plan presently in effect or being installed in the United States, (3) four weeks vacation per year, (4) a stock option for 3,000 shares of Tricat's Class B non-voting stock at $16 per share as a "signing bonus," (5) participation in any annual company stock and cash bonus plans, (6) that with respect to severance, "if terminated for reasons other than 'cause' six months salary. Ongoing termination will be developed," and (7) that Tricat was to provide limited personal legal assistance, personal tax return assistance, and pay medical and other coverages during the COBRA period.

According to appellants, in March, 1996, the Board of Directors of Tricat, at a meeting attended by Dr. Maher and appellee, approved appellee's employment at a salary of $120,-000 per year for a trial period of six months. Between then and late July, 1996, several written documents were generated between Dr. Maher and appellee, which took the form of new employment agreements, "[a]ddenda to employment agreement," "clarification of employment agreement," a memo, and a "side letter." The documents addressed the terms of appellee's employment, and while most were undated, they purported to be effective as of March 1, 1996. Some of the agreements recited that appellee's salary had been increased to $160,000 and provided for a 3–year term of employment.

According to appellants, in June, 1996, at a board of directors meeting attended by Dr. Maher and appellee, the board refused to approve a salary for appellee in excess of $120,000. Subsequent to that meeting, appellee retained an attorney, with Dr. Maher's consent, who drafted an employment agreement between appellee, on the one hand, and Tricat and Tricat Management on behalf of its subsidiaries, on the other hand. This agreement (hereinafter Agreement) did not bear a date of execution, but the circuit court determined, based on uncontradicted evidence, that it had been executed on July 31, 1996. The Agreement expressly indicated that it had been executed by Dr. Maher as both "President" of Tricat and as "authorized agent" of Tricat Management.

The Agreement contained an "explanatory statement," which provided as follows:

> Employee currently provides services to the Employers pursuant to a contract dated March 1, 1996. Because of time pressures at the time such contract was entered into, and the desire of the Employers to have the Employee begin his employment at the earliest possible date, certain understandings with regard to the Employee's employment by the Employers were not adequately referenced or set forth in the original contract, and both the Employee and the Employers wish to clarify and set out in writing their agreement as to those additional understandings, and incor-

porate them with the original contract into one document for ease of reference.

The Agreement also provided that it "supersedes and replaces in its entirety the employment agreement dated as of March 1, 1996 between the Employee and Tricat in effect prior to the execution of this Agreement." The Agreement provided for a three-year term commencing as of March 1, 1996, "which term shall be extended on February 28, 1997, and on each anniversary of that date thereafter for a further period of one year to a date three years from the date of the extension, unless otherwise terminated in accordance with Section 11 hereof."

Section 11 of the Agreement provided that appellee would receive severance pay equal to three years compensation if terminated without cause. Finally, in pertinent part, the Agreement provided for an annual salary of $160,000 retroactive to March 1. The evidence is in conflict as to whether this Agreement was ever approved by the board of directors. The terms of Tricat's bylaws were disputed at trial, but there was some evidence that its bylaws provided that the board of directors had to approve officers' salaries.

On December 4, 1996, Dr. Maher terminated appellee for cause but requested him to remain until January 31, 1997 to tie up loose ends. The purported cause for termination was that he devoted too much time to personal matters, misused company resources, had a volatile temperament, and failed to produce work on time. Subsequently, the board of directors removed Dr. Maher as President of Tricat and managing director of KataLeuna.

Appellee sued for breach of the Agreement for failure to make severance payments. At the time of trial, the circuit court determined that the Agreement was valid and binding as a matter of law and submitted only one question to the jury, i.e., whether appellee's employment was terminated for cause or without cause. The jury returned a verdict for appellee in the amount of $500,000. Additional facts will be discussed as necessary as we address the issues.

## Questions Presented

### *Appellants*

A. Did the trial court err in holding, as a matter of law, that a corporate officer's alleged contract, containing a six-figure severance arrangement, was valid and binding, where there was extensive evidence to the contrary?

B. Did the trial court err in refusing to give any instruction whatsoever to the jury as to what constitutes "just cause" for the termination of a contract employee under established principles of Maryland law?

C. Did the trial court err by instructing the jury that it could not consider anything that happened after a corporate officer was notified of his termination, where there was evidence that after that date, but before the date the employers' alleged obligation to pay severance pay began, the officer removed and/or failed to return thousands of corporate documents, materially breaching the same agreement which he was seeking to enforce, and which he contended required the payment of $500,-000 severance pay to him?

D. Did the trial court improperly shift the burden of proof to the Defendant employers, by instructing the jury that the Defendants had the burden of proving that they terminated the Plaintiff employee for just cause?

E. Did the circuit court err in holding that venue was proper in Baltimore City?

### *Appellee*

F. Did the trial court err in declining to award Harper pre-judgment interest at the constitutional rate of six percent from the date of the breach of Harper's employment contract on February 1, 1996, through the date judgment was entered in favor of Harper on April 20, 1999, in the amount of $66,409.52?

## Discussion

### A.

Appellants contend that the circuit court erred in ruling as a matter of law that the Agreement was valid and binding. First, appellants contend that the Agreement, which contained a salary and severance package in excess of that approved by the board of directors in March, 1996, was never approved by the board and that such approval was required. Appellants further contend that Dr. Maher had neither actual nor apparent authority to enter into the Agreement providing for a salary in excess of $120,000 a year or for more than a six-month term.

Appellants explain that there was no evidence of actual authority, and with respect to apparent authority, words or conduct of the principal is required—in this case—the board. Additionally, the agent—in this case—appellee, had a duty to investigate the scope of authority, and most important, appellee had actual knowledge that Dr. Maher lacked authority. The knowledge was obtained from the bylaws and from attendance at the board of directors meetings in March and June. Appellants conclude that they were entitled to a ruling as a matter of law that the Agreement was invalid, or alternatively, if appellants were not so entitled, the issue should have been submitted to the jury.

Second, appellants argue that the existence of multiple agreements created a dispute of fact with respect to the terms of the actual agreement. The circuit court held that the Agreement was valid and binding and, based on the parol evidence rule, instructed the jury that it could not consider evidence of prior agreements to alter or vary the terms of the Agreement.[1]

---

1. The circuit court held that the Agreement was ambiguous because there was no date of execution. The circuit court admitted extrinsic evidence relating to that issue and ultimately determined that there was no dispute and that the Agreement was executed on July 31, 1996. The circuit court also permitted extrinsic evidence relating to agreements created prior to that time on the ground that it was relevant to the

Appellants contend that the parol evidence rule does not apply when the issue is whether the contract was properly formed or whether it was intended to be a fully integrated agreement.

Relying on *Whitney v. Halibut, Inc.*, 235 Md. 517, 527, 202 A.2d 629 (1964), appellants argue that the parol evidence rule does not apply to the following questions: (1) have the parties made a contract?, (2) is that contract void or voidable because of illegality, fraud, mistake, or any other reason?, and (3) did the parties assent to a particular writing as the complete and accurate 'integration' of that contract? Appellants, in their brief, summarize the relevant evidence as follows:

The contract upon which Harper relies is not internally dated, and does nothing to supersede his February hire letter, in which his salary was specified to be $120,000, and his severance package was six months' pay. Additionally, Harper continued to renegotiate actively the terms of his employment even after the document upon which he bases this suit was signed, and he continued to be compensated in accordance with earlier agreements that were not incorporated into the alleged contract. Accordingly, the evidence showed that the document was not regarded by anyone—let alone Harper—as a complete, final and binding agreement. Based on all the evidence, there was a material dispute of fact as to whether there was ever a final meeting of the minds of the parties as to Harper's terms and conditions of employment, whether Harper ever intended the purported agreement to be final and binding, whether the company board of directors ever authorized any employment terms for Harper other than those approved at the March board meeting, and whether Harper knew that board approval was required. The parol evidence rule applied to none of these

---

question of whether appellee had been terminated for cause based on appellants' argument that appellee had been spending too much time attempting to negotiate a better deal.

With respect to Dr. Maher's authority, the circuit court held that such evidence was not admissible because there was no provision in the Agreement providing that it was subject to board approval.

issues, all of which bore directly on the question of whether the alleged contract was valid and binding. The jury should have been allowed to consider the history of all the prior agreements because it related to these questions.

(Footnote and record extract references omitted.)

Appellee argues that Dr. Maher, as President and managing agent, is presumed to have authority to enter into the Agreement. Appellee points to evidence that (1) the Agreement was signed by Dr. Maher and appellee and that no further writings were executed subsequent to that time, (2) the Agreement was not expressly conditioned upon approval by the board of directors, (3) appellee was not privy to the approved minutes of the board of directors, (4) Dr. Maher wanted appellee's employment contract to be rewritten into one document, (5) appellee testified that in July, 1996, he had received no direction from the board of directors restricting Dr. Maher's authority to sign employment contracts, (6) appellee dealt with Dr. Maher as the chief executive officer of the companies, (7) appellee did not have official signed copies of the company's bylaws, (8) appellee would not have continued in his employment if Dr. Maher had not signed the Agreement, (9) the board did nothing to terminate or advise appellee that his contract would not be honored, and (10) appellants did honor the Agreement to the extent of paying for appellee's post-termination health insurance benefits.

Additionally, appellee argues that appellants are judicially and collaterally estopped from challenging the validity of the Agreement. Appellee explains that appellants, in pleadings filed in this case, took the position that they were not bound to the Agreement for a variety of reasons. Subsequent to taking that position, Tricat filed a replevin action in the district court for Baltimore City, seeking the return of all documents appellee had acquired while employed by appellants. Appellee asserts that this action was based on § 8 of the Agreement, which provided for the return of the documents. According to appellee, appellants admitted that the Agreement was binding, and the District Court, on December

10, 1998, ruled in favor of Tricat. Appellee thereafter returned the documents. No appeal was taken. *See Tricat Industries, Inc. v. Harper,* Case No. 0028521-98 (District Court for Baltimore City). Appellee concludes that the appellants are judicially estopped from taking an inconsistent position in circuit court after winning in the district court.[2] Even though estoppel was not the rationale for the circuit court's decision, appellee argues that we can decide the issue because it was argued below.[3]

Finally, appellee points out that if his retention of documents constituted a breach of the Agreement, such breach was not *material* as a matter of law. Consequently, it had no effect on appellants' obligation to make severance payments.

With respect to appellants' argument that the existence of multiple contracts created a dispute of fact as to the terms of the operative contract, appellee asserts that the Agreement was admittedly signed and expressly superseded the prior agreements. Thus, the prior agreements were properly excluded by the parol evidence rule. The circuit court did admit the predecessor contracts with respect to the date of execution, which ultimately was resolved by the court, and because they were relevant to the question of whether appellee was terminated for cause or without cause. According to appellee, the court properly gave a limiting instruction to the jury that

---

**2.** Appellee relies on *King v. Herbert J. Thomas Memorial Hospital,* 159 F.3d 192 (4 th Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 1576, 143 L.Ed.2d 671 (1999), for a statement of the elements of the doctrine, and several Maryland decisions, including *Eagan v. Calhoun,* 347 Md. 72, 87–89, 698 A.2d 1097 (1997), for the proposition that Maryland recognizes the doctrine. As stated in *King,* the elements are "(1) [t]he party to be estopped must be asserting a position that is factually incompatible with a position taken in a prior judicial or administrative proceeding; (2) the prior inconsistent position must have been accepted by the tribunal; and (3) the party to be estopped must have taken inconsistent positions intentionally for the purpose of gaining unfair advantage." *King,* 159 F.3d at 196.

**3.** Appellee mentions collateral estoppel and *res judicata* but offers no argument in that regard.

the predecessor agreements could only be considered with respect to the latter issue.[4]

The difficulty with appellee's position that the Agreement is valid as a matter of law is that it ignores evidence contrary to his position. Dr. Maher testified as follows:

Q: Dr. Maher, I am showing you what was already admitted into evidence as Plaintiff's Exhibit No. 5. That is the employment contract that Mr. Harper is seeking to enforce in this case. There has been testimony that that employment contract was entered into after the March, 1996, meeting. Do you remember that?

A: Yes. As I recall, this was entered into in June or July of 1996. And it was never approved by the board of directors, and I was wrong to have signed it when it didn't have the board approval. And we knew, and I discussed it with Mr. Harper, that contracts as called for in the bylaws, that

---

4. Appellee identifies three issues raised by appellants in footnotes in their brief and argues that we should not consider them because they were not properly presented. *See* Rule 8–504.

First, appellants state that the circuit court precluded the jury from considering evidence that appellee's "claimed lost benefits (health insurance and stock options) had actually been provided to him by Tricat following his discharge, thus decreasing the damages to which he was actually entitled."

If we were to hold that the Agreement is valid and binding, we agree there would be no issue specifically relating to damages that is properly before us. We note that appellants excepted to the verdict sheet and observed that there was a dispute as to whether appellee had been paid benefits, but the thrust of appellants' position was that a jury should decide the terms of the employment agreement between the parties. Given that position, it necessarily follows that the amount of any damages could only be determined after a resolution of that issue. In light of our disposition of issue A, all damage issues can be addressed on remand.

Second, appellants assert that, because appellee was a corporate officer, he had the burden of proving that the Agreement was fair. To the extent that this is an issue not implicitly addressed in our discussion of the main issues, we agree that it is not properly before us and decline to address it.

Third, appellants assert that approval by the board of directors was an unfulfilled condition precedent to the Agreement. This issue is subsumed in issue A, and in light of our discussion of that issue, we need not further address this point.

contracts had to be approved by the board of directors, and—

Q: Was this contract ever approved by the board of directors at any time after you signed it?

A: No, it was not.

. . . .

Q: When you and Mr. Harper entered into the contract that has been admitted as Plaintiff's Exhibit No. 5, did you know that you were violating the directions of the board of directors?

A: Yes, I did. I was wrong. I knew I was wrong. I told Mr. Harper I was wrong because the board had told me not to—had told us, and Mr. Harper was there—and told us that they would not approve these increased salaries over $120,000—

. . . .

Q: Did you hope that at a later time to maybe get the board of directors to approve a higher salary for Mr. Harper?

A: Mr. Harper insisted that he—that we could convince the board to approve—to approve these higher salaries. I would always, if I signed something, make my best effort to make that happen. But the board did not approve it and were adamant that they would not approve a higher salary.

Q: Were you present at a meeting of the board of directors in June at which Mr. Harper's salary was discussed?

A: Yes.

Q: Was Mr. Harper also present at that meeting?

A: Yes, Mr. Harper was at that meeting of the board.

Q: At that meeting, what, if any, limitations upon your authority were communicated to Mr. Harper by the board?

A: Well, the board, as—just as I had in the past, said that they had to approve any employment agreements, and they

did not approve the ones that increased his salary above $120,000 a year.

Q: Okay, and Mr. Harper was present and you were present when the board said that?

A: That's right.

At another point in the proceedings, Dr. Maher testified:

Q: The compensation committee had the responsibility of looking at executive salaries, is that not right?

A: Yes, as one of their duties.

. . . .

A: They, the audit committee and conference committee, compensation committee, looked at all of the, all of the agreements that had been signed, and they had strong words, particularly about Mr. Harper because they said the board had only approved $120,000 salary and we were paying him more. And, as I said, I was wrong. I never should have done that. And I had to pay for it later.

Q: Do you know why it was that those strong words never appeared in the minutes of the board?

. . . .

THE WITNESS: Well, I know that it certainly wasn't necessary to because it was in the bylaws of the corporation that no salary could be approved without—of the top executives without board approval. Mr. Harper didn't do that. I had discussed it with him. I had talked verbally. As I tried to tell, we—the way of trying to do business is talking to the different directors before the board meeting occurred.

Q: When in time did you tell this to Mr. Harper?

A: Every time he demanded a change in his salary, I told him yes, but I can't—it bothers me, you don't deserve it, I'm wrong, and it has to be approved by the board and I don't think they're going to do it.

Q: None of the contracts that you signed for Mr. Harper ever said that they were subject to board approval, did they?

A: Well, it—but I told him they were subject to board approval and the bylaws of the corporation said board approval, and he had copies of the bylaws of the corporation. He knew that everything—it had to be approved; any compensation, any agreements had to be approved by the board.

Additionally, Robert Manheim, a former director, testified that, at the June, 1996 board of directors meeting, the board refused to approve more than $120,000 a year salary for a six-month term. Mr. Manheim testified as follows:

Q: Did Mr. Harper have reason to know, based on your knowledge, that Dr. Maher's authority to give him raises was limited?

. . . .

THE WITNESS: Paul Harper was present at the board meetings where his compensation was discussed. He understood that the board of directors was voting on his compensation in March when we hired him. And I believe that he would not be qualified for his position as a chief financial officer if he didn't have a basic understanding of the relative authority of the board of directors over its officers. That's a basic universal function. We hire officers. We set the salary. No officer can set his own salary. No two officers can set their own salary.

A document purporting to be Tricat's bylaws was admitted into evidence. Although contradicted, there was testimony that the relevant provision requiring board approval of officers' salaries had never been deleted and that appellee had knowledge of that provision.

There was evidence that the board of directors never saw the Agreement. Appellee testified that a side consulting arrangement survived the Agreement even though it was not mentioned in the Agreement. Similarly, he testified that a

side letter providing appellee with a $10,000 family vacation allowance survived the Agreement even though it was not mentioned in it.

"The fundamental principles regarding the authority of an officer or agent of a corporation are substantially the same as those applicable to agents generally." Williston *on Contracts* (4th ed.), § 35:66 (hereinafter "Williston"); *Fuller v. Horvath,* 42 Md.App. 671, 402 A.2d 134 (1979). An officer's authority may be actual or apparent. *Id.* Actual authority may be express or implied. Williston § 35:67.

■ An officer of a corporation has implied authority to enter into employment contracts without formal authorization by the board of directors if they are within the scope of the corporate purposes. *See Atholwood Development Co. v. Houston,* 179 Md. 441, 445, 19 A.2d 706 (1941); *Eastern Shore Brokerage & Commission Co. v. Harrison,* 141 Md. 91, 99–102, 118 A. 192 (1922). The general rule of implied authority applies, however, in the absence of evidence of actual authority. *Hagerstown Brewing Co. v. Gates,* 117 Md. 348, 359, 83 A. 570 (1912).

A person who deals with a corporate officer has no right to rely on implied or apparent authority if such person has sufficient knowledge of facts to make inquiry with respect to the officer's actual authority, or if the person has actual knowledge of the officer's actual authority. Williston, § 35:70; *Prince George's Country Club, Inc. v. Edward R. Carr, Inc.,* 235 Md. 591, 609, 202 A.2d 354 (1964) ("One dealing with an agent must use reasonable diligence and prudence to ascertain whether the agent acts within the scope of his powers and this rule is applicable to those who deal with another as the officer or agent of a corporation. 13 Am.Jur. Corporations. Sec. 891. *See also* Sec. 1056."); *Pradhan v. Maisel,* 26 Md.App. 671, 677, 338 A.2d 905 (1975) (when all parties are aware that the existence of a binding contract with a corporation requires a signature in addition to that of the president, the president does not have apparent authority to execute a binding contract).

■ In the case before us, appellee was the chief financial officer and vice president of Tricat. Appellee had access to bylaws and to the board of directors. Most important, there was evidence that appellee had actual knowledge that Dr. Maher did not have actual authority to approve the terms of the Agreement.

■ Appellee suggests that the board ratified the Agreement. There is evidence that the Agreement was never presented to the board and that the board did not have knowledge of its contents until after appellee's employment was terminated. There is also evidence that, when appellants paid appellee certain benefits after termination, they did not do so pursuant to the Agreement but rather pursuant to the terms of the initial agreement. In light of that evidence, we cannot hold that there was ratification as a matter of law. *See* Williston §§ 35:22–35:29. *Compare with Annapolis Fire & Marine Ins. Co. v. Rich,* 239 Md. 573, 585–86, 212 A.2d 249 (1965)(where the facts were sufficient to support a finding of ratification).

■ The extrinsic evidence admitted below, if properly admitted for the purpose of showing that the Agreement was not valid and binding, was sufficient to present a jury question on that issue. This brings us to a discussion of whether the parol evidence rule precluded its admission for that purpose. With respect to parol evidence, "Maryland law generally requires giving legal effect to the clear terms of a contract and bars the admission of prior or contemporaneous agreements or negotiations to vary or contradict a written contractual term." *Calomiris v. Woods,* 353 Md. 425, 432, 727 A.2d 358 (1999); *Rinaudo v. Bloom,* 209 Md. 1, 6, 120 A.2d 184 (1956). "All courts generally agree that parol evidence is admissible when the written words are sufficiently ambiguous." *Calomiris,* 353 Md. at 433, 727 A.2d 358. The determination of ambiguity is one of law, not fact, and the determination is subject to *de novo* review by the appellate court. *Id.* at 434, 727 A.2d 358. In determining whether a writing is ambiguous,

Maryland adheres to the law of the objective interpretation of contracts. *Id.* at 435, 727 A.2d 358.

■ The parol evidence rule only applies, however, when there is a binding written contract. Williston § 33:1; Restatement (Second) of Contracts § 213 (1981). Parol evidence is admissible, therefore, to show that a writing never became effective as a contract or that it was void or voidable. *Rinaudo,* 209 Md. at 9, 120 A.2d 184. Williston § 33:17; *Pradhan, supra* at 678, n. 2, 338 A.2d 905 "('Parol evidence is admissible not to alter or contradict the terms of a written contract but to show that there was not a contract at all or that the writing was not to become one until a certain time or until the happening of certain events.' *Lutz v. Porter,* 206 Md. 595, 600 [112 A.2d 480 (1955)]."); *Gordy v. Ocean Park, Inc.,* 218 Md. 52, 145 A.2d 273 (1958).

■ *Gordy* involved an action by a real estate broker for a commission due under an alleged contract of sale. *Id.* at 58, 145 A.2d 273. The owner argued that it was never intended to be a contract and that a formal contract was to be executed later. *Id.* The question of whether the parties intended the writing to be a contract was submitted to the jury. *Id.* at 62, 145 A.2d 273. The Court stated that the question before it was not one of construction because, before construing a contract, there must first be a contract. 218 Md. at 60, 145 A.2d 273. Parol evidence is admissible to show that a particular written paper was never intended as a contract or as the binding record of a contract between the parties. *Id.* The parol evidence rule has no application unless the paper is presented as the contract. *Id.* at 62, 145 A.2d 273. We conclude that parol evidence was admissible with respect to the issues of authorization and ratification.

■ Appellants argue that parol evidence was admissible to show that the Agreement was not valid and binding for additional reasons: (a) it lacked consideration, (b) it was not intended to be a contract, and (c) it was not a fully integrated agreement. Parol evidence is admissible for these purposes as well, but the trial court, on remand, will have to make a

determination as to whether the evidence is legally sufficient to create jury questions with respect to the first two issues. Appellants do not assert that other exceptions to the parol evidence rule are applicable. *See* Williston § 33.1. On retrial, if the jury finds that the Agreement was a valid and binding contract, it may not consider parol evidence to vary or contradict its terms.

With respect to the issue of integration, on this record, there is no evidence of any prior agreement relating to severance benefits intended to retain an independent existence in addition to the Agreement in question. Even if there were and the Agreement were found not to be a fully integrated contract, *see* Williston § 33.20, and *Rinaudo,* 209 Md. at 10, 120 A.2d 184, if a jury finds that the Agreement was an authorized, binding contract, parol evidence could not be considered to vary or contradict its terms.

 With respect to judicial estoppel, the District Court transcript reveals that appellants did not assert that the Agreement was valid, nor did the district court so find. The district court was apprised of the pendency of this action and the positions taken by the parties. The validity of the contract was expressly left for decision by the circuit court. We see no factual basis for the imposition of estoppel.

It is unnecessary to address the remaining issues raised by the parties for the disposition of this appeal, but we will do so in general terms because they may arise on remand.

### B.

Appellants contend that the circuit court failed to instruct the jury as to what constitutes just cause for termination of a contractual employee. Appellants requested the following instructions:

**Defendants' Requested Jury Instruction No. 14:** Under Maryland law, 'Contract provisions do not eliminate the basic principle that gives an employer the right to discharge for good cause even though such right is not stated in the

agreement' 'and even though the agreement may delineate certain specific causes for discharge.'

Therefore, the contract provision providing the reasons for termination in this case is not exclusive, but 'is a cumulative remedy. [It] does not bar the ordinary remedy of termination for a breach which is material, or which goes to the root of the matter or essence of the contract.'

**Defendants' Requested Jury Instruction No. 15:** 'When an employer because of an employee's wrongful conduct can no longer place the necessary faith and trust in an employee [the employer] is entitled to dismiss such employee without penalty. This is especially true where the employee has a responsible position where faith and trust are required....'

'An employer may terminate an employee for suspected criminal activity or a sincere belief that the employee is untrustworthy.'

**Defendants' Requested Jury Instruction No. 16:** Under Maryland law, "[M]isconduct that renders an employee 'incompatible' with the employer may constitute 'just cause,' even if the action is not ... 'actually injurious to the employer's business, or ... gross or evil.' " This is true whether or not the employee's contract actually says so.

**Defendants' Requested Jury Instruction No. 17:** 'In every employment contract, the employee promises either expressly or by implication that he or she will perform the work in a diligent and reasonably skillful manner.... An employer, therefore, may discharge an employee who fails to perform his or her duties accordingly...."

Assuming a valid Agreement, appellants contend that the definition of cause contained in section 11 is not exclusive and that they could terminate appellee's employment on common law grounds, *i.e.*, when his conduct caused loss of faith and trust in him, because his conduct rendered him incompatible with his employers, or because he failed to perform work in a reasonably skillful manner. Appellants contend the court erred in not giving their requested instructions that accurately state these common law grounds.

The instructions actually given by the circuit court were as follows:

The documents in evidence should be considered only as they relate to the issue of termination for cause or without cause. You are instructed that the employment agreement entered into by the parties, which is in evidence as plaintiff's Exhibit No. 5, is a valid and binding agreement between the parties which allows the defendants to terminate the plaintiff's employment for cause as specified in paragraph no. 11.2 of the agreement. The plaintiff, Paul Harper, contends that he was terminated in his employment by the defendants without cause. The defendants contend that the plaintiff was terminated with cause.

The defendants could have discharged the plaintiff for cause under paragraph no. 11.2 of the agreement which states—and you will have the agreement with you—that "in the event that the employee shall by wilful action or inaction breach any material provisions of this agreement or engage in dishonest or criminal conduct, then employee's employment and employer's obligation to pay the employee compensation may be terminated effective immediately at any time during any term of this agreement."

Now as I said, paragraph no. 11.2 states that the employee may be terminated for breach of any material provisions of this agreement. I instruct you that a breach is material if it affects the purpose of the contract in an important or vital way. The burden of proving that the plaintiff was terminated for cause is on the defendants. It is your function as jurors and finders of fact, based on the evidence you have heard, to determine whether or not the plaintiff, Paul Harper, was terminated for cause.

Appellants point to the language of the Agreement itself as being non-exclusive. Section 11 contains subsections designated as 11.1, 11.2, and 11.3. Subsection 11.1 provides for termination by either party without cause. Subsection 11.2 provides for termination by employers with cause and states, "Notwithstanding the terms of § 11.1, above, in the event that the employee shall, by wilful action or inaction (i) breach any

material provisions of this Agreement, or (ii) engage in dishonest or criminal conduct, then employee's employment and the employer's obligation to pay the employee compensation may be terminated, effective immediately, at any time during any term of this Agreement." Subsection 11.3 is labeled, "Other Remedies" and provides: "Neither the grant nor the exercise of a right of termination hereunder shall preclude any other legal relief or remedy available to any party, and nothing contained in this § 11 shall relieve the employers of the duty to pay the employee compensation for services performed prior to the date of termination of the employee's employment duties." Appellants point to § 11.3 as an express indication that the reasons for cause contained in § 11.2 are not exclusive. Appellants rely primarily on *Shapiro v. Massengill,* 105 Md.App. 743, 661 A.2d 202, *cert. denied,* 341 Md. 28, 668 A.2d 36 (1995), and *Chai Management v. Leibowitz,* 50 Md.App. 504, 439 A.2d 34 (1982), for the proposition that the reasons contained in the Agreement and common law grounds are cumulative, and that their requested instructions accurately stated the common law grounds.

Appellee, relying primarily on *Regal Savings Bank v. Sachs,* 352 Md. 356, 722 A.2d 377 (1999), asserts that parties can define "cause" by contract, and that cause must constitute a material breach of the contract or go to its essence. If cause is not defined in the contract, then a court may use general implied terms to define it if the operative facts are material to the contract. In this case, according to appellee, the two grounds contained in § 11.2 of the Agreement are exclusive, and § 11.3 of the Agreement has nothing to do with the definition of cause.

While the circuit court held that the Agreement did provide exclusive grounds for cause, appellee observes that the trial judge stated that it did not matter anyway, because the Agreement expressly stated that appellee could be terminated for breach of any material provision contained therein, and section 2 required appellee to exert his best efforts in the performance of his duties to promote the employer's business. According to the circuit court, this left appellants free to put

their "spin" on the facts. Appellee points this out in support of the general proposition that the instructions actually given fully and fairly covered appellants' theory of the case.

If a contractual provision providing for termination for breach is not exclusive, it does not bar the remedy of termination for a breach that is material or that goes to the essence of the contract. *Foster–Porter Enterprises v. De Mare*, 198 Md. 20, 36, 81 A.2d 325 (1951). In that case, the contract in question contained a provision that stated the following:

> The following shall be deemed to be events of default hereunder: (a) If either party shall breach any obligation contained in this agreement, and such default shall continue for a period of ten days after written notice from the party not in default specifying the nature of the breach; (b) If the Distributor is unable to continue in this business on an active basis, bearing in mind its seasonal character; [ (d) ] If proceedings of any kind in bankruptcy or insolvency or receivership, State or Federal, shall be brought against either the Distributor or the Seller, and such proceedings are not vacated within thirty days after institution; then and upon the happening of any one of said events of default the party not in default shall have the right to terminate this agreement by written notice to the other.

198 Md. at 27–28, 81 A.2d 325. The Court stated that "unless a contract provision for termination for breach is in terms exclusive (*Bartol v. Gottlieb–Bauernschmidt–Straus Brewing Company*, 129 Md. 32, 98 A. 286 [(1916)] ), it is a cumulative remedy and does not bar the ordinary remedy of termination for 'a breach which is material, or which goes to the root of the matter or essence of the contract.' " *Foster–Porter*, 198 Md. at 36, 81 A.2d 325. The Court further stated, "if plaintiff had committed a material breach of his contract, Foster–Porter could have terminated the contract without regard [to the express provisions]. [Under those provisions], the contract could be terminated for a breach of obligation which did not amount to a material breach." The effect of this holding was

that the contract was terminated for cause even though the ten days notice specifying the nature of the default provision had not been complied with.

In our view, the exclusivity requirement was not met by the Agreement in question. Section 11.2 did not expressly purport to be exclusive, and 11.3 stated that the remedy of termination granted in the contract did not preclude any other *legal relief or remedy* available to any party. *Compare with Bartol,* 129 Md. at 40, 98 A. 286 (where the language was clear and exclusive).

Having determined that the provision in the Agreement relating to cause is not exclusive, the following cases are instructive with respect to the common law. In *Peurifoy v. Congressional Motors,* 254 Md. 501, 255 A.2d 332 (1969), the Court of Appeals had before it an oral contract of employment. The employee sued for breach of contract, and the trial court granted a directed verdict in favor of the defendant. *Id.* at 502, 255 A.2d 332. The employee sued for failure to pay compensation and alleged that the termination was unwarranted. *Id.* at 509, 255 A.2d 332. The parties argued over what the terms of the contract were and whether it was definite enough to be enforceable. *Id.* at 514, 255 A.2d 332. The Court stated that it did not have to decide those issues because, whatever the terms of the contract were, the contract was "clearly subject to the constructive concurrent condition that the employee [ ] would render service as a comptroller and general manager in a reasonably satisfactory manner and in accordance with generally accepted standards for that employment." *Id.* at 515, 255 A.2d 332. The Court stated that the evidence demonstrated that he breached the agreement, and therefore, he could not recover compensation for his services after his breach. *Id.*

In *Shapiro,* there was a written contract which provided in part: "I expect the term of this arrangement to go for at least one year, assuming we both continue working as we anticipate. However, we each reserve the right to cancel the arrangement after 9 months with the next 90 days to count as part of the

year." 105 Md.App. at 752, 661 A.2d 202. The employee was an attorney who was discharged by his employer, a law firm, for failure to reveal that he was involved in a federal investigation in connection with his prior employment. *Id.* at 749–50, 661 A.2d 202. The employee sued for breach of contract. *Id.* at 750, 661 A.2d 202. The employee argued on appeal that the contract was for a definite term as a matter of law. *Id.* at 753, 661 A.2d 202.

This Court in *Shapiro* recognized that if a contract is one for a definite term, it may only be terminated for just cause. *Id.* at 754, 661 A.2d 202. If a contract is at will, it can be terminated without cause. *Id.* We held that whether the contract was at will or for a term was ambiguous, and that it was properly submitted to the jury. *Shapiro,* 105 Md.App. at 756, 661 A.2d 202. In *Shapiro,* the contract was silent with respect to termination for cause. *Id.* at 756, 661 A.2d 202. Assuming that the jury found that the contract was for a fixed term, we stated that the contract provisions did not eliminate the basic principle that an employer has the right to discharge an employee for good cause even though such right may not be stated in the agreement. *Id.* at 757, 661 A.2d 202. On those facts, we acknowledged that this included loss of faith and trust or even incompatibility. *Id.* at 757, 763, 661 A.2d 202. We emphasized, however, that what constitutes just cause varies with the nature of the employment. *Id.* at 758, 661 A.2d 202.

In *Shapiro,* the jury instructions given by the trial court were upheld. *Id.* at 761, 661 A.2d 202. We did not hold that the specific instructions given relating to loss of faith and trust and incompatibility were necessarily required, however, and we certainly did not hold that they are required in all cases.

In *Chai Management, Inc.,* we held that a discharge for cause resulted in forfeiture of termination pay with respect to termination for cause. 50 Md.App. at 513–14, 439 A.2d 34. The contract in that case was silent as to cause. *Id.* at 505, 439 A.2d 34. It was also silent as to duration but provided for 60 days notice before termination. We held that the employee

was not entitled to 90 days pay following a material breach of the contract and his termination for cause. *Id.* at 514, 439 A.2d 34. We stated that the 60–day notice requirement did not eliminate the basic principle regarding employment contracts, which gives an employer the right of discharge for good cause even though the right is not stated in the agreement or the agreement delineates certain specific causes for discharge. *Id.* at 513, 439 A.2d 34.

In *Sachs v. Regal Savings Bank,* 119 Md.App. 276, 705 A.2d 1 (1998), *aff'd, Regal Savings Bank v. Sachs,* 352 Md. 356, 722 A.2d 377 (1999), we held that summary judgment in favor of the employer was improper because the question of whether the breach of employment contract was material was a question for the jury, and that the employee was not entitled to summary judgment because of evidence that he had violated the employer's internal rules and federal regulations. The contract did not define cause. We repeated our statements in *Shapiro* to the effect that there is no single definition of good cause, and it varies with the nature of the employment. *Sachs,* 119 Md.App. at 284, 705 A.2d 1. The *Sachs* case, in both appellate courts, dealt with the propriety of summary judgment and not jury instructions.

What was the alleged breach in this case? Appellants assert that the evidence revealed "flagrant misbehavior and incompetence [that] violated the employer's faith and trust and called into question [appellee's] judgment, honesty, and fitness for the position of chief financial officer." They assert that he "diverted company time, company resources, and company employees for extensive personal frolics," "put his own self interest ahead of the interests of the company," was "crude, intemperate, and incompatible," "failed to perform the main functions of his job as chief financial officer," "violated the faith and trust of the company board of directors," and "insisted on being paid as a 'consultant' even though his alleged employment contract in every formal version specified that he was a full-time 'employee.' "

Section 2 of the Agreement provided that appellee would perform his duties and functions as he may be called upon to perform by the President of Tricat and that he would exert his best efforts in the performance of his duties so as to promote the profit, benefit, and advantage of the business of his employer. Appellants offer nothing to indicate that they were restrained from making any arguments relating to breach/good cause that were not encompassed within the language in the Agreement.

The nature of cause varies, and like other similar concepts, the nature of an instruction will vary from case to case. For example, in a given case, negligence may be defined generally, whereas in another case it may be defined more specifically and with reference to the evidence. The point is that appellants, even though the Agreement's statement of cause is not exclusive, are not necessarily entitled to instructions that employ the language of their choice. They are only entitled to full and fair instructions.

On retrial of this case, the question of whether the Agreement is valid will be a jury question. Consequently, (1) to the extent there are arguments supported by the evidence with respect to alleged breaches recognized by law but not covered by the language in the Agreement, if found to be valid, or (2) because the Agreement may be found invalid but some other agreement exists, "cause" may be determined by common law, the court can fashion instructions, in addition to the language in the contract, as appropriate.[5] The instructions should include a statement that appellee's employment could be terminated only for a material breach by appellee which constituted just cause.

## C.

Appellants contend that the court erred in instructing the jury to disregard events after appellee was notified that his

---

**5.** We note that appellee's counsel stated at oral argument that appellee's position is that the Agreement is valid, and if found not to be so, there was no other agreement, implying an at will relationship.

employment had been terminated. Appellants explain that, at the time of termination, appellee failed to disclose the fact that he had retained company records. These documents were returned only after a District Court trial. Consequently, appellee was in breach at the same time that he was claiming that appellants had an obligation to pay. Alternatively, appellants assert that appellee failed to fulfill a condition precedent for severance pay, and the condition was material because it required appellants to go to the expense and trouble of a court action.

Appellants requested the following instruction:

Under the express terms of the contract that Plaintiff seeks to enforce in this case, the Plaintiff was prohibited from removing the employer's documents from the employer's premises except in the performance of his duties as an employee. Further, he was required to surrender any of the employer's documents to the employer at the termination of his employment, or prior to termination upon the employer's request. If you determine that Plaintiff did not comply with this obligation, and that that was a sufficiently material breach so as to relieve the employer of any obligation to pay compensation to the Plaintiff, you should find in favor of the Defendants.

The court actually instructed the jury as follows:

You have heard testimony concerning company documents which plaintiff kept and which the defendants demanded that he return. And you have heard testimony concerning a lawsuit filed for the return of these documents. I instruct you that for the purposes of considering the issue currently before you ... you should disregard all of that evidence as well as any other evidence regarding events which took place after December 4, 1996.

Appellants argue that the instruction prevented the jury from considering the effect of appellee's refusal to return documents on his breach of contract claim. Additionally, appellants assert that "at a minimum," on equitable grounds, the evidence was relevant to damages.

Appellee asserts that the circuit court struck the evidence relating to the failure to return documents on the ground that it was irrelevant. Appellee states that it was not a material breach, in any event, and that appellants are judicially estopped for reasons explained above.

We agree with the circuit court that the evidence was irrelevant. We fail to see how withholding documents, even if it constituted a breach, after the contract was terminated for cause, is relevant to whether cause existed for the termination. Additionally, while withholding documents, assuming it constituted a breach, might support an action for damages, for which no claim is being made, it would not relieve appellants of their contractual obligations. *See Evergreen Amusement Corp. v. Milstead,* 206 Md. 610, 621–22, 112 A.2d 901 (1955).

### D.

The circuit court instructed the jury that the burden of proving that appellee had been terminated for cause was on appellants. Appellants assert that this improperly shifted the burden of proof and explain that the existence of cause was not an affirmative defense, as characterized by the court, but was a reason why appellants were not liable for breach of contract. We perceive no error.

In *Foster–Porter,* the question was whether the manufacturer had the right to terminate a distributorship agreement because of breach by the plaintiff in failing to make sales. The Court of Appeals held that the burden of proof was on the defendant manufacturer and sustained the trial court's factual determination that the manufacturer had failed to prove a material breach of the distributorship agreement sufficient to justify termination. 198 Md. at 29, 81 A.2d 325. We believe the issue before us is analogous, and we hold that the burden of proving cause for termination is on appellants.

### E.

Appellants contend that the circuit court erred in ruling that Baltimore City was the proper venue to maintain

this action. Md.Code, Cts. & Jud. Proc. Art. § 6–201, sets forth the general rule and provides:

> *(a) Civil actions.*—Subject to the provisions of §§ 6–202 and 6–203 and unless otherwise provided by law, a civil action shall be brought in a county where the defendant resides, carries on a regular business, is employed, or habitually engages in a vocation. In addition, a corporation also may be sued where it maintains its principal offices in the State.
>
> *(b) Multiple defendants.*—If there is more than one defendant, and there is no single venue applicable to all defendants, under subsection (a), all may be sued in a county in which any one of them could be sued, or in the county where the cause of action arose.

Appellants argue that both defendants carried on a regular business in Baltimore County and that this was the single venue applicable to both defendants.

Appellee contends that KataLeuna waived the issue by not raising it in its Rule 2–322 motion but only included it in its answer. Consequently, only Tricat has standing to raise this issue on appeal. Appellee further states that Tricat engaged in regular business in both Baltimore City and Baltimore County, and consequently, the choice of venue was for appellee. Appellee recites the relevant facts as follows:

> As set forth in Harper's initial memorandum in opposition to Tricat's motion to dismiss, Harper, by affidavit, placed before the trial court the following facts relating to Tricat's regular business in Baltimore City: (1) Its resident agent Anilkumar J. Hoffberg, Esq., had his offices for receipt of service of process, among other things, in Baltimore City, (2) Harper himself was a Baltimore City resident who did much of his work for Tricat out of his home in Baltimore City, (3) Tricat, during Harper's period of employment, did business with and through Baltimore City-based corporation Contract Materials Processing, Inc., located in Curtis Bay, Baltimore City, (4) A Tricat employee was physically located in a trailer at CMP's Baltimore City facility carrying out a

research and development program for Tricat and KataLeuna, and CMP sold for the benefit of Tricat, and KataLeuna, molecular sieves supplied by Tricat and KataLeuna which CMP stored at its Curtis Bay facility, (5) Tricat maintained an escrow account, the funds for which were drafted in Baltimore City banking institutions, at and through Mr. Hoffberg's Baltimore City office and Mr. Hoffberg likewise maintained Tricat business records and transacted other business for Tricat there. Standing alone, Tricat's contacts with Baltimore City were sufficient to permit the laying of venue in the Circuit Court for Baltimore City as to it.

(Record extract references omitted.)

Additionally, according to appellee, KataLeuna had no principal place of business in Maryland and, therefore, could be sued in Baltimore City where appellee resided. See § 6–202(3). Appellee argues that § 6–202 provides venues that are alternatives to those provided in § 6–201. *See Wilde v. Swanson,* 314 Md. 80, 548 A.2d 837 (1988).

Appellants respond that there was no legally sufficient factual support for the assertion that Tricat was engaged in regular business in Baltimore City at the time of filing suit.

The Court of Appeals in *Wilde* stated that the legislative history of §§ 6–201, 6–202, and 6–203 makes it clear that § 6–202 "presents certain options to a plaintiff for alternative venues to those available under § 6–201. Neither section enjoys a priority over the other." *Id.* at 92, 548 A.2d 837. The Court referred to the legislative history as follows:

In Report No. 3F to the General Assembly of July 16, 1973, the Commission described its proposed venue subtitle, saying in part:

"Venue is treated pragmatically with § 6–201 stating the general rule that a defendant should, when possible, be tried in a county which is convenient for him—*i.e.*, where he lives or works. If present law allows an alternative venue as it does in certain cases, the additional venue is set out in § 6–202. It should be noted that a plaintiff may choose a venue from either section, and that § 6–201

is not controlling if an alternative venue is provided. Some of the actions covered in § 6–201 and 6–202 are transitory and some are local.

Section 6–203 contains venues for actions to which the general rule does not apply. While some of these are local actions, most are transitory but are statutory exceptions to the general rule. If an action is listed in § 6–203, that section controls the venue, unless § 6–202 provides an additional venue. If an alternative venue is provided, the plaintiff may elect either one."

*Id.* at 47–48. Finally, of no little persuasive effect is the fact that Judge Adkins of this Court, who was Revisor of Statutes and Director of the Commission while the Courts and Judicial Proceedings Article was prepared, wrote in 1974 that § 6–202 "is intended to permit the plaintiff to choose either a venue permitted by section 6–201 or one permitted by section 6–202. That is, the sections are cumulative and not mutually exclusive." Adkins, *Code Revision in Maryland: The Courts and Judicial Proceedings Article,* 34·Md.L.Rev. 7, 36 (1974)(footnote omitted).

*Id.* at 93–94, 548 A.2d 837.

In *Green v. North Arundel Hospital Ass'n, Inc.,* 126 Md. App. 394, 730 A.2d 221, *cert. granted,* 356 Md. 17, 736 A.2d 1064 (1999), this Court, relying on *Wilde,* noted that C.J. § 6–202(8) provides an alternative venue in negligence actions allowing plaintiffs to bring suit in the county where the cause of action arose. We relied on *Wilde* for the proposition that, when multiple venues are proper under both C.J. § 6–201 and C.J. § 6–202, the plaintiff can choose to proceed under either section. *Green,* 126 Md.App. at 406, 730 A.2d 221.

In this case, KataLeuna did not have a principal place of business in the state, and therefore, an alternative venue was available under § 6–202.

## F.

 Appellee contends that it was entitled to pre-judgment interest. He argues that the damages in the amount of

$500,000 were not disputed, nor was the date payable disputed. As a result, interest was mandatory and not discretionary. *See Crystal v. West & Callahan, Inc.*, 328 Md. 318, 614 A.2d 560 (1992); *United Cable Television of Baltimore Limited Partnership v. Burch*, 354 Md. 658, 732 A.2d 887 (1999).

Appellants argue that the issue was not preserved because there was no argument or evidence presented with respect to pre-judgment interest prior to appellee's motion to alter or amend. Additionally, according to appellants, the amount was not certain or definite, referring to the existence of a side letter, the consulting arrangement, and other documents. There was a genuine dispute with respect to entitlement to severance pay, and the Agreement set no date for payment of the severance pay. Finally, appellants point out that the amount was not reduced to present value because the judgment was rendered more than three years after termination of employment. Consequently, appellee would be unjustly enriched if awarded prejudgment interest.

On one extreme, interest is not permitted on unliquidated claims, which are typically tort claims. On the other extreme, if a contract requires the payment of a sum certain on a date certain, interest is ordinarily allowed as a matter of right. If it is a contract case that falls "somewhere in between" the two extremes, interest lies at the discretion of the fact finder. *See Crystal*, 328 Md. at 343, 614 A.2d 560. In *United Cable*, 354 Md. at 667, 732 A.2d 887, the Court of Appeals explained:

> Prejudgment interest comes in two varieties, discretionary and of right. Both versions are 'in the nature of an element of damages.' *Maryland State Highway Administration v. Kim*, 353 Md. 313, 327, 726 A.2d 238, 245 (1999). There we said that
>
>> "those instances in which prejudgment interest is allowed as a matter of course [are] because 'the obligation to pay the amount due had become certain, definite, and liquidated by a specific date prior to judgment so that the effect of debtor's withholding payment was to deprive the

creditor of the use of a fixed amount as of a known date.' "

Anticipating that the issue may arise again, we think this is a contract case falling between the extremes and the award of prejudgment interest is discretionary.

**JUDGMENT REVERSED; CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR A NEW TRIAL CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEE.**