**CONTRACTS MATERIALS PROCESSING, INC.,**
Plaintiff,

v.

**KATALEUNA GMBH CATALYSTS,**
et al., Defendants.

No. AMD 98–147.

United States District Court,
D. Maryland.

Sept. 18, 2001.

Joseph S. Lyons, Towson, MD, Paul S. Richter, Richter, Miller & Finn PH, Washington, DC, for plaintiff.

Barbara Susan Wahl, Washington, DC, Evan Scott Stolove, Arent Fox Kintner Plotkin and Kahn, Washington, DC, for defendants.

Benjamin Sorrells Boyd, Piper Marbury Rudnick and Wolfe, Washington, DC, Carolann Ascolillo Alexander, Houston, TX, Alice A. Brown, Houston, TX, for Mobil Oil Corporation

## MEMORANDUM

DAVIS, District Judge.

The plaintiff, Contract Materials Processing, Inc. ("CMP"), instituted this damages action against KataLeuna GmbH Catalysts ("KataLeuna"), Tricat Management GmbH ("Tricat") and Tricat Catalytic Products ("TCP"), alleging breach of contract, misappropriation and conversion.[1] Jurisdiction is based on diversity of citizenship. KataLeuna has asserted several counterclaims against CMP.[2] The conversion claims have previously been dismissed.[3]

Now pending is the defendants' motion for partial summary judgment as to plaintiff's remaining claims. Related to this motion are CMP's motion to file a surreply and defendants' motion to strike CMP's exhibits and portions of CMP's declarations. I have given careful attention to the parties' memoranda and exhibits, and a hearing is not needed. Local Rule 105.6. For the reasons explained below, I shall strike from the record and not consider significant portions of plaintiff's summary judgment materials and I shall grant in part and deny in part defendants' motion for partial summary judgment.

(i)

Pursuant to Fed.R.Civ.P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material for purposes of summary judgment, if when applied to the substantive law, it affects the outcome of the litigation. *Id.* at 248, 106 S.Ct. 2505. Summary judgment is also appropriate when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

A party opposing a properly supported motion for summary judgment bears the burden of establishing the existence of a genuine issue of material fact. *Anderson,* 477 U.S. at 248–49, 106 S.Ct. 2505. "When a motion for summary judgment is made and supported as provided in [Rule 56], an adverse party may not rest upon the mere

---

1. CMP's amended complaint included 13 counts: Count I: Collection of amounts due on account under Research and Development Agreement; Count II: Collection of amounts due on account under Sales Agency Agreement; Count III: Damages and other relief based upon bailment; Count IV: Breach of Technology Transfer Agreement by KataLeuna; Count V: Misappropriation of FCC additives technology by KataLeuna; Count VI: Conversion of FCC additives technology by KataLeuna; Count VII: Liability of Tricat under the Technology Transfer Agreement; Count VIII: misappropriation of FCC additives technology by Tricat; Count IX: Conversion of FCC Additives Technology by Tricat; Count X: Liability of Tricat for acts of Kata-Leuna under Counts I, II, and III; Count XI:

Liability of TCP under the Technology Transfer Agreement; Count XII: Misappropriation of FCC additives technology by TCP; and Count XIII: Conversion of FCC additives technology by TCP.

2. KataLeuna's Counterclaim alleges: Count I: Breach of the technology transfer agreement; Count II: Breach of the research and development agreement; Count III: Breach of the Sales Agency Agreement; Counts IV–VI: Unjust Enrichment in respect to all three agreements; Count VII: Conversion; and Count VIII: Negligence.

3. Counts VI, IX and XIII, *supra* note 1, were dismissed on August 11, 1999.

allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavit or as otherwise provided in [Rule 56] must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). *See Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505; *Shealy v. Winston*, 929 F.2d 1009, 1012 (4th Cir.1991). Of course, the facts, as well as the justifiable inferences to be drawn therefrom, must be viewed in the light most favorable to the nonmoving party. *See Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The court, however, has an affirmative obligation to prevent factually unsupported claims and defenses from proceeding to trial. *See Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir.1987).

(ii)

Subject to the motion to strike, discussed *infra* part (iii), in considering defendants' motion for summary judgment, I view the facts in the light most favorable to CMP, the nonmoving party, and shall accept its account of the facts as true wherever its version of events differs from those submitted by the defendants.

*The Parties and their Principals*

Plaintiff CMP is a Maryland corporation that provides services to the chemical industry, including the manufacturing of additives and catalysts that aid in refining petroleum. CMP is the signatory to three contracts at the center of the current litigation. Its president and principal is Dr. Edwin Albers, a resident of Maryland.

Defendant KataLeuna is a German corporation that is also involved in the chemical industry and, along with CMP, the signatory to the three contracts at issue in this case. From 1995 until January 1997, Dr. P. Kenerick Maher ("Maher") was the Chairman of KataLeuna. During that time, 25.2% of KataLeuna was owned by an arm of the German government, the BvS, and 74.8% of KataLeuna was owned by defendant Tricat.

Defendant Tricat is a German corporation, a holding company, that was managed by Maher during the period relevant to this dispute. Tricat is apparently itself a wholly owned subsidiary of Tricat Industries, Inc. ("TII"), an American corporation, which is not a defendant in this case but which seems to sit at the top of a corporate hierarchy around which this case revolves. Since October 1997, J. Gary McDaniel, ("McDaniel") has been the managing director of Tricat.[4] As of January 1, 1997, Tricat divested itself of all its interest in KataLeuna.

Defendant TCP, another German corporation, is a wholly owned subsidiary of defendant Tricat. It was formed approximately at the same time that Tricat ceased to hold any interest in KataLeuna. Maher is the managing director of TCP.

*The Negotiations*

In 1995, Maher contacted Albers to discuss Maher's interest in acquiring CMP's fluidized cracking catalyst ("FCC") additives technology. FCC additives are chemical additives that are designed to increase the effectiveness and efficiency of the fluidized cracking catalysts in the overall refining process. This contact followed an earlier similar contact Maher had made in 1993 on behalf of TII. Thus, in early May 1995, Maher and Albers met in Balti-

---

4. McDaniel also serves as the president of Triadd, an unincorporated division of Tricat, and a former division of KataLeuna. McDaniel was one of the inventors of the technology transferred from CMP to KataLeuna.

more to discuss Maher's business interests.[5]

On May 1, 1995, Maher, individually and on behalf of TII, entered into a "Non-Disclosure Agreement" with CMP whereby each party agreed to maintain the confidentiality of all information disclosed by the other during the course of their discussions concerning the proposed business venture. Thereafter, on May 8, 1995, Maher and Albers met to discuss Maher's proposal. According to Albers, Maher disclosed that he had formed Tricat, a company in Germany, for the purpose of joining with an arm of the German government, the BvS, to purchase and ultimately to privatize a catalyst operation. Maher advised Albers that he believed that acquiring the FCC additives technology would aid Tricat in its negotiations with the BvS. Albers indicated that he was interested in selling the technology for a consideration of $9 million, including deferred or royalty payments.

On May 31, 1995, Maher and Albers met again to further discuss the proposal. At the meeting, Maher advised that he had signed a preliminary agreement with the BvS on behalf of Tricat and TII. Maher reiterated his interest in acquiring all of CMP's FCC additives business. At Albers's request, Maher sent CMP a preliminary proposal, which stated that TII wanted to purchase CMP's FCC additives technology.

On or about June 4, 1995, Maher sent a two page proposal to Albers. This proposal contemplated that KataLeuna would acquire all of CMP's FCC additives business and all of CMP's know-how and trade secrets relating to the FCC additives, including but not limited to patent applications that CMP had filed, certain other FCC related technologies in the developmental stage, CMP's FCC additives customer information, and certain testing procedures and manufacturing processes. This proposal contemplated that in exchange TII would make an initial payment of $2 million and a final payment of up to $7 million based upon company performance. In addition, this proposal contemplated that CMP would provide additional research and development. Under this proposal, McDaniel would be permitted to join KataLeuna as Vice President and General Manager.

On June 23, 1995, Maher and Albers discussed the formation of KataLeuna, the company that would utilize the FCC additives technologies. Maher represented that KataLeuna was planning to invest more than $16 million in KataLeuna's new FCC additives plant. While most of the investment would be from the German government, TII and Tricat would be required to secure over $10 million in funding. During the negotiations, Maher informed Albers that KataLeuna, TII and Tricat were not and had not been engaging in any FCC additives business and had no FCC additives technology.

Finally, in early fall 1995, CMP and KataLeuna executed three contracts relating to sales, research and development, and the transfer of CMP's technology. Anilkumar Hoffberg, Esq. ("Hoffberg"), counsel for Maher, KataLeuna and the other Tricat related entities, assumed responsibility for drafting the written agreements.

*The Agreements*

The first agreement CMP signed was a three year Sales Agency Agreement. In it, KataLeuna appointed CMP as its exclusive sales agent for the sale of zeolites in the United States. KataLeuna agreed to pay CMP $20,000 a month in exchange for

---

**5.** Maher and Albers had known each other for 30 years.

its services. In addition, CMP was to receive commissions. The Sales Agreement contained an express integration clause.

CMP also executed a Technology Transfer Agreement on or about October 27, 1995, in which CMP agreed to "sell, assign, convey and transfer [its] entire right, title and interest in and to" its FCC additives technologies ("Technology") to KataLeuna. Technology Transfer Agreement at ¶ 3. Through this agreement, CMP transferred to KataLeuna CMP's entire FCC additives business, including but not limited to patent applications, that CMP had filed, CMP's business plan relating to the FCC additives business, customer information, testing procedures, manufacturing processes, and other technologies related to the FCC additives business. In exchange, CMP was to receive 5,000 shares of TII's stock, $1.9 million at closing, and a supplemental payment not to exceed $7.6 million. The supplemental payment component was to be calculated based upon the gross margin generated by KataLeuna and its subsidiaries' FCC Additives Operation. Under this agreement, CMP also permitted TII to employ McDaniel as Vice President and General Manager of KataLeuna's newly created FCC additives technology division. Although the agreement contained a provision binding successors and assigns, the agreement did not contain a provision that authorized either party to assign the agreement. At all times relevant, CMP retained copies of the Technology.

At this time, CMP also entered into a Research and Development Agreement ("R & D Agreement"). Through the R & D Agreement, CMP agreed to conduct further research and development of the Technology that it transferred to KataLeuna. Albers was to receive $400,000 as compensation for one year of such research. The R & D Agreement contained an express integration clause.

On or about October 27, 1995, CMP and KataLeuna also entered into a written Tolling Agreement. CMP agreed to provide toll manufacturing services for KataLeuna for a fixed fee. This agreement also contained an express integration clause.

*Performance Under the Agreements*

After entering into the agreements, CMP fully disclosed all of its information relating to the Technology to KataLeuna. In October 1995, McDaniel terminated his employment with CMP and entered into an employment agreement with TII to work for KataLeuna, bringing with him copies of CMP's files relating to the Technology. TII employed him as President and General Manager of KataLeuna's newly created FCC additives division known as Triadd. In his new position, McDaniel' responsibilities included overseeing the complete transfer of all CMP's Technology to KataLeuna. McDaniel also controlled the research that CMP conducted under the R & D Agreement.

On or about April 1996, McDaniel advised Albers that TII had hired John McCauley ("McCauley") as KataLeuna's Director of Research and Development of FCC additives. As a result, McCauley and McDaniel were jointly responsible for specifying and controlling the research that CMP was to perform under the research and development agreement. To facilitate KataLeuna's ability to utilize the Technology, McCauley primarily worked at a laboratory physically located within CMP's premises. McCauley worked in this laboratory on a regular basis from April 1996 until October 1996.

On April 11, 1997, TII advised CMP in writing that KataLeuna's FCC additives division, Triadd, had been sold to TCP effective as of April 1, 1997. Consequent-

ly, the Technology that had been transferred from CMP to KataLeuna was transferred to TCP. During the course of these events, KataLeuna never sought CMP's consent for the transfer. Albers also learned that on April 24, 1997, the BvS, KataLeuna, Maher, TII, Tricat and TCP entered into the April 1997 Separation Agreement whereby Tricat relinquished its interest in KataLeuna. Again, CMP's consent was never sought.

*Current Litigation*

CMP alleges that KataLeuna is in default under all three agreements, namely the Technology Transfer Agreement, the Sales Agency Agreement and the R & D Agreement. Furthermore, with respect to the Technology Transfer Agreement, CMP alleges that KataLeuna, Tricat, TCP or its affiliates have misappropriated the Technology and are utilizing the Technology, despite the fact that KataLeuna has not paid CMP any supplemental payments. KataLeuna denies that any defendants are using the technology and accordingly, denies that it owes CMP any royalty payments. Moreover, defendants allege that CMP has itself breached the agreements and that the technology transferred to KataLeuna did not perform as promised, thereby causing KataLeuna to "abandon" it.

#### (iii)

CMP relies upon three declarations and attached exhibits in an effort to show that genuine issues of material fact exist, thus precluding adjudication of its claims on summary judgment. Defendants, through their motion to strike, raise various objections to portions of these declarations and their attachments. For the reasons explained in this part, I agree with defendants that much of the material on which CMP bases its opposition to the motion for summary judgment may not be considered.

■ The Federal Rules of Civil Procedure provide that all evidentiary material made in support of or in opposition to a motion for summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed.R.Civ.P. 56(e); *see, e.g., Evans v. Techs. Applications & Serv. Co.,* 80 F.3d 954, 962 (4th Cir.1996). Where an affidavit does not meet these standards, it falls prey to a motion to strike. *Id. (citing Rohrbough v. Wyeth Labs., Inc.,* 916 F.2d 970, 975 (4th Cir.1990)); *Maryland Highways Contractors Ass'n v. Maryland,* 933 F.2d 1246, 1252 (4th Cir.1991), *cert. denied,* 502 U.S. 939, 112 S.Ct. 373, 116 L.Ed.2d 325 (1991). Thus, a court may strike portions of affidavits that lack personal knowledge, contain hearsay, or rest upon conclusory statements. *Evans,* 80 F.3d at 962. Defendants argue that the following materials do not comply with the strictures of Rule 56(e).

*Richter's Declaration and Attached Exhibits*

■ Defendants move to strike various portions of the declaration of Paul Richter, Esq., lead counsel for CMP, dated March 5, 2000.[6] Defendants generally object to Richter's Declaration, arguing that it constitutes improper testimony by counsel. I agree. Throughout the 11 page declaration, Richter engages in the unsound practice of acting as both lead counsel and key witness. "[I]t is elementary that

---

**6.** Although the declaration is dated March 5, 2000, this is probably an error; the correct date should read March 5, 2001.

counsel may not participate both as an advocate and as a witness, absent special circumstances." *Spivey v. United States,* 912 F.2d 80, 84 (4th Cir.1990); *see also Inglett & Co. v. Everglades Fertilizer Co.,* 255 F.2d 342, 349 (5th Cir.1958) ("[I]t is an unnatural, if not virtually impossible, task for counsel, in his own case, to drop his garments of advocacy and take on the somber garb of an objective fact-stater.").

■ Defendants also contend that the Richter Declaration violates Rule 56(e) because it contains inadmissible hearsay, attaches unauthenticated documents, asserts information not based upon personal knowledge, offers unqualified translations and irrelevant information. Specifically, defendants urge that paragraphs 2–5, 10, 11, 13, 14, 15, 19, 23, 24, 25, 26, 27, 28, 32, 33, 34, and 35 of Richter's Declaration should be stricken because they are based upon improper translations of German documents supplied by Richter. These translations are equivalent to an interpreter's testimony and therefore are not admissible unless the translator's qualifications are established. Fed.R.Evid. 604. Here, Richter has completely neglected to establish his qualifications as a translator. Richter's statement that he is "competent" to provide accurate translations hardly suffices.[7] Richter Dec. at ¶ 3. In addition, these paragraphs of the declaration are seriously flawed because they omit the translations of the German documents. In these paragraphs, Richter simply supplies his opinion and interpretation of the German documents without providing his translation. These are serious deficiencies; accordingly, I will grant defendants' motion to strike paragraphs 2–5, 10, 11, 13, 14, 15, 19, 23, 24, 25, 26, 27, 28, 32, 33, 34, and 35 of Richter's Declaration.

Defendants further object to paragraphs 9, 17, 18 and 20 because their contents are not based upon personal knowledge.[8] Indeed, paragraphs 9, 17, 18 and 20 are all deficient.[9] Moreover, Richter failed to

---

**7.** Richter also states that the court should find that he is qualified as an interpreter because "[he] has provided English translations of German text for the Court upon his personal knowledge on at least eight prior occasions in this case without substantial or substantive objection to the accuracy of this translations." Pl.'s Opp. to Defs.' Mot. to Strike at 7 n. 14. Not only is this statement insufficient to establish Richter's qualifications to translate German documents, this statement was not provided under oath.

**8.** As CMP notes, defendants erroneously cited paragraph 11 instead of paragraph 17. Defendants also objected to paragraphs 2, 23, 24, 32 and 33 on the grounds that they were not based on personal knowledge. Because these paragraphs have been stricken on other evidentiary grounds, this evidentiary issue will not be examined.

**9.** Paragraph 9 simply refers to information contained within a memorandum from Jack Maher, dated March 30, 1998. Richter does not state any basis as to how he has personal knowledge of the facts contained therein. Paragraphs 17, 18 and 20 are likewise problematic; they read as follows:

> TMG and TCP also caused the prosecute [sic] of the various FCC additive patent applications originally filed with the U.S. Patent Office by CMP to be transferred to TII's control. These included U.S. patent application serial numbers: 08/432,996, 08/878,074, 08/523,434, and 08/526,976. This is shown by official records in the U.S. Patent Office and documents in the office of the patent attorney, Arthur Steiner, who was prosecuting those applications. This is also referred to in Exhibit 9 hereto. Richter's Dec. at ¶ 17. (The attached exhibit to which Richter refers does not provide support for the averments.)

> Beginning in June, 1997 TII filed in its name as owner a series of other "new" FCC additive patent applications. This is shown by official records in the U.S. Patent Office and documents in the office of the patent attorney, Arthur Steiner, who prepared and prosecuted those applications. Richter's Dec. at ¶ 18.

> On December 22, 1997, TMG transferred it 74.8% share interest in KataLeuna to Mar-

provide any explanation as to how he could have obtained such first hand knowledge.[10] Consequently, I shall grant defendants' motion to strike portions of Richter's Declaration and paragraphs 9, 17, 18 and 20 are stricken.

■ Defendants also argue that paragraphs 21, 22, 29, 30, and 31,[11] which discuss both the July 1998 KataLeuna–CRI Reprivitization Agreement and the April 1997 Separation Agreement, are inadmissible because they do not contain relevant information. Defendants contend that these paragraphs are merely an attempt to reargue that KataLeuna is not the "real party in interest" with respect to KataLeuna's counterclaims. After spending significant time combing through these paragraphs of Richter's Declaration, I must agree with defendants. These paragraphs address only whether KataLeuna or the BvS is the real party in interest—an issue that I have already ruled upon.[12] CMP fails to demonstrate how this information is relevant to proving CMP's claims or defending against defendants' counterclaims.[13] CMP, apparently conceding the lack of relevancy of this information, requests that I "defer ruling on these relevancy objections because the defendants cannot be prejudiced if the Court considers evidence that is truly irrelevant. . . ." Pl.'s Opp. to Defs.' Mot. to Strike at 11 n. 25. Here, CMP has completely failed to establish the relevancy to the pending motions. In addition, CMP has created an exhaustive record that is replete with inadmissible evidence. The court has spent significant time reviewing CMP's exhibits and declarations, sifting out the admissible evidence. The court is not inclined to expend further resources analyzing information where CMP has failed to offer any tenable arguments regarding its relevancy. Accordingly, paragraphs 21, 22, 29, 30 and 31 will be stricken.

■ Defendants also move to strike Exhibits 1, 2, 5, 12 and 13 attached to Richt-

tin Isink as Trustee for the BvS. As a result, the BvS then owned 100% of KataLeuna (*i.e.,* 25.2% directly and 74.8% through Isink as its trustee) and controlled and dominated KataLeuna. Richter's Dec. at ¶ 20.

10. Although Richter cites the deposition testimony of Dr. Frank Goerlitz as additional support for paragraph 20, CMP neglected to provide these pages to the court.

11. Defendants also objected to paragraphs 2, 10, 23, 24, 25, 26, 27, 28, 32, 33, and 34 as containing irrelevant information. However, because those paragraphs were stricken for other reasons, stated above, their relevancy will not be examined.

12. After extensive briefing and oral argument, I concluded that BvS had properly agreed to be bound by this action, making KataLeuna a proper party in interest. *See* Order dated Aug. 30, 2000. I also denied CMP's Motion for Reconsideration. *See* Order dated Oct. 16, 2000.

13. Despite my prior ruling, CMP insists that the information cited within the paragraphs is relevant to determine whether KataLeuna or BvS is the real party in interest. CMP's argument is as follows:

Mr. Richter's statements provide relevant factual background information about the BvS which was a party to the 1995 Privatization Agreement, the 1997 Separation Agreement, the August 1998 Agreement which amended the 1997 Separation Agreement and the July 1998 KataLeuna–CRI Reprivatization [sic] Agreement. Additional [sic] the BvS is or may be the real party in interest with respect to KataLeuna's counterclaims against CMP. Pl.'s Opp. to Defs.' Mot. to Strike at 9–10.

CMP also attempts to argue that the information is relevant because it demonstrates representations that CMP relied upon when entering into the Technology Transfer Agreement with KataLeuna. CMP, however, fails to offer any explanation of how CMP's alleged reliance is at all relevant or admissible.

er's declaration as inadmissible hearsay.[14] With respect to Exhibits 2, 5, 12 and 13, namely the 1995–1996 Schitag, Earnst & Young Report, 1996 AudiCon Report, 1997 Schitag, Earnst & Young Report, and 1998 Price Waterhouse Report, CMP argues that the reports are admissible as party admissions under Fed.R.Evid. 801(d)(2)(D). Defendants contend that these statements do not qualify as party admissions because the drafters of the reports were neither employees nor agents of defendants.

■■ Rule 801(d)(12)(D) provides that a statement is not hearsay if it is "offered against a party and is ... a statement by the party's agent ... concerning a matter within the scope of the agency ... made during the existence of the relationship." Fed.R.Evid. 801(d)(2)(D). Because Congress intended the Federal Rules of Evidence to have uniform nationwide application, federal common law rules of agency apply, rather than agency law of the forum. *Boren v. Sable*, 887 F.2d 1032, 1038 (10th Cir.1989). The Supreme Court has outlined several factors that a court should consider to determine whether a party is an employee or independent contractor:

> In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to additional products to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Farlow v. Wachovia*, 259 F.3d 309, 313 (4th Cir.2001) (internal quotations omitted) (quoting *Community for Creative Non–Violence v. Reid*, 490 U.S. 730, 751–52, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989)).[15] The proponent of the evidence has the burden to demonstrate that an individual qualifies as an "agent." *Oki America, Inc. v. Microtech Int'l, Inc.*, 872 F.2d 312, 314 (9th Cir.1989); *American Eagle Insurance Co. v. Thompson*, 85 F.3d 327, 333 (8th Cir. 1996); *Lippay v. Christos*, 996 F.2d 1490, 1497 (3d Cir.1993). CMP failed to make this showing, however. It did not establish that the drafters of the audit reports were "agents" of defendants as opposed to independent contractors.[16] Nor did CMP establish that the contents of the reports were adopted by defendants.[17] Therefore,

---

**14.** Defendants also object to paragraphs 9, 10, 13, 25, 26, and 28 as containing inadmissible hearsay. These objections have been rendered moot, however, since these paragraphs have been stricken on other evidentiary grounds.

**15.** Although *Farlow* and *Reid* involved the issue of whether a party was an independent contractor or agent under Title VII of the Civil Rights Act of 1964, the factors articulated are applicable to the case at bar.

**16.** CMP's entire argument is as follows: "KataLeuna engaged Audicon as its agent to prepare the Audit Report accurately and correctly. Audicon accepted the engagement to prepare the Audit Report and completed and issued the final Audit Report during the course of the relationship with KataLeuna." Pl.s' Surreply at 9–10.

**17.** CMP argues that the contents of these reports were adopted by the defendants and cites the memorandum from Jack Maher to McDaniel and Roller dated March 30, 1998. CMP alleges that the memorandum incorpo-

I will strike exhibits 2, 5, 12, and 13. Despite defendants' objections, however, I conclude that Exhibit 1, the memorandum dated March 30, 1998, from Jack Maher, is not hearsay because it consists of admissions of a party opponent. Therefore this exhibit will not be barred.

*Dr. Albers' Declaration and Attached Exhibits*

Defendants next move to strike portions of the declaration of Dr. Edwin Albers, the president of CMP, dated March 5, 2001. Defendants' first objection concerns paragraphs 28, 31, 38 and 44, which include alleged oral representations made prior to the execution of the Technology Transfer Agreement. Specifically, Albers states that Maher made oral representations that served to restrict KataLeuna's right to sell, assign, transfer, and disclose the FCC additives technology ("Technology") transferred in the Technology Transfer Agreement to any Tricat entity. Albers also states that KataLeuna's counsel was advised specifically not to include an integration clause in the Technology Transfer Agreement unless all oral representations were included within the agreement. Not surprisingly, defendants object to the admission of the paragraphs contending that these paragraphs should be stricken because they contain inadmissible parol evidence.

■ The case law in Maryland is clear.[18] Where a contract is plain in its meaning, there is no room for construction and it is presumed that the parties meant what they expressed. In the absence of fraud, duress or mistake, parol evidence is not admissible to vary or contradict the terms of a written instrument. *See, e.g., Equitable Trust Co. v. Imbesi,* 287 Md. 249, 271, 412 A.2d 96, 107 (1980); *Kermisch v. Savings Bank of Baltimore,* 266 Md. 557, 560, 295 A.2d 776 (1972); *Foreman v. Melrod,* 257 Md. 435, 442, 263 A.2d 559, 562 (1970); *Rinaudo v. Bloom,* 209 Md. 1, 9–10, 120 A.2d 184, 192 (1956); *Markoff v. Kreiner,* 180 Md. 150, 154–55, 23 A.2d 19, 23 (1941). " 'All prior and contemporaneous negotiations are merged in the written instrument, which is treated as the exclusive medium for ascertaining the extent for their obligations.' " *Foreman,* 257 Md. at 441, 263 A.2d at 562 (citations omitted).

■ Contrary to CMP's assertions, the Technology Transfer Agreement clearly and unambiguously expresses the parties' intentions and obligations. The Technology Transfer Agreement repeatedly states that CMP transferred its entire right in the Technology to KataLeuna without any restrictions on KataLeuna's right to transfer the technology.[19] Thus, proper appli-

rates and quotes information contained within the reports. The audit reports are in German, however, and CMP has failed to provide proper translations. Thus, the court has no means by which to verify whether the cited memorandum incorporates information contained within the reports.

18. The Technology Agreement contains a clause stating that Maryland law will govern the application of the agreement, and both parties agree that Maryland law should apply. Accordingly, I will look to Maryland law to construe the Technology Agreement.

19. The Technology Transfer Agreement could not be more clear:

[s]ubject to the terms and conditions of this Agreement, the Seller shall sell, assign, convey and transfer to the Buyer the Seller's entire right, title, and interest in and to the Technology, including without limitation the right to make, use and sell the same anywhere in the world. . . .

Ex. 3A at ¶ 3 to Defs.' Mem. in Support of Mot. for Partial Summ. J.

The Technology Transfer Agreement further provides that any future rights or research related to the technology being sold to KataLeuna would be available to KataLeuna for no additional consideration. *Id.* at ¶ 18(b). An unqualified "successors and assign" provi-

cation of the parol evidence rule precludes admission of these alleged oral representations; consequently, I will strike paragraphs 2, 8, 31, 38 and 44.[20]

Defendants also urge the court to strike paragraphs 59–68 and the exhibits cited within these paragraphs. These paragraphs concern certain patent applications. Defendants argue that these paragraphs should be stricken because they are not relevant. Despite CMP's assertions that information regarding the patent applications is relevant to its claims, CMP has failed to proffer any explanation defending the relevancy of these paragraphs.[21] Therefore, these paragraphs will be stricken.

Defendants also argue that paragraphs 12, 13 and 31, which relate to a 1995 Non–Disclosure Agreement ("Non–Disclosure Agreement"), should be stricken because CMP failed to produce the Non–Disclosure Agreement during discovery. CMP contends that the Non–Disclosure Agreement and sworn statements relating to it should not be stricken because Defendants had access to it. Because CMP failed to produce this agreement, I shall bar CMP from introducing the Non–Disclosure Agreement into evidence.

Moreover, the defendants cite additional concerns regarding the admissibility of the Non–Disclosure Agreement. Although CMP urges the court to consider this document, CMP fails to address defendants' concerns. Specifically, CMP fails to address the relevancy of this document. CMP relies on the Non–Disclosure Agreement to support its misappropriation of trade secrets claims. CMP fails, however, to establish or even allege that trade secrets were disclosed under the auspices of this agreement. Even more confusing, CMP has failed to explain why this document is relevant to any claims against KataLeuna—an entity which was never a party to the Non–Disclosure Agreement. Further, it is clear that the Non–Disclosure Agreement was designed solely to maintain confidentiality during the negotiations and that this agreement was superseded by the subsequent agreements between CMP and KataLeuna.[22] For these reasons, and because CMP has failed to address these concerns, I will bar CMP from relying upon this exhibit. Consequently, these paragraphs are stricken.

Finally, defendants also seek to strike portions of Dr. Albers' declaration that they contend contain conclusory allegations. Paragraph 31 states that KataLeuna's attorney was advised not to include an integration clause. In Paragraphs 54, 55 and 56, Albers states in a conclusory fashion that CMP performed all of its obligations under the agreements. Paragraph 56 states simply that KataLeuna unilater-

---

sion is also included within the Technology Transfer Agreement. *Id.* at ¶ 16.

**20.** Paragraph 31 of Albers' Declaration stating that defendants' counsel "was advised that the Technology Transfer Agreement could not contain an integration clause" is also inadmissible because it is hearsay. Albers' Dec. at ¶ 31.

**21.** CMP merely asserts that paragraphs 59–68 of the Albers' Declaration and Exhibits 11–15 "go to the very heart of CMP's misappropriation and breach of contract claims and are referenced throughout CMP's opposition to

defendants' motion for partial summary judgment." Pl.'s Opp. to Defs.' Mot. to Strike at 18. However, CMP fails to ever explain how these allegations apply to CMP's claims or defendants' counterclaims (except for stating repeatedly that "they go the heart of CMP's claims.")

**22.** The Non–Disclosure Agreement expressly states that "it shall apply only to the information disclosed to the Parties for the purpose of facilitating the discussions concerning the new business." Non–Disclosure Agreement at § 10.

ally terminated the Technology Transfer Agreement on January 1, 1997. Because these paragraphs contain nothing more than self-serving opinions and are not supported by any other admissible evidence submitted by the parties, I will grant defendants' motion to strike these paragraphs.

*Edwin Albers Jr.'s Declaration and Attached Exhibits*

■ Defendants argue that paragraphs 3, 4 and 5, as well as the second and third sentences of paragraph 6 of the declaration of Edwin Albers Jr. ("Albers, Jr.") must be stricken because they contain nothing but legal conclusions and conclusory statements of facts. Albers, Jr. states in paragraph 3 that "CMP fully performed all of its obligations." Yet, there is no explanation or supporting facts for this bold assertion. Likewise in paragraphs 4 and 5, Albers, Jr. comments on CMP's compliance under the Sales Agency Agreement stating: (1) CMP provided services on a regular basis; (2) CMP maintained detailed logs relating to their efforts; and (3) maintained and preserved normal business records. Albers, Jr. Dec. at 4–5. CMP did not provide the court with any of these records. Therefore, these paragraphs will be stricken.

Paragraph 6 is likewise problematic. The second and third sentences of paragraph 6 read:

> Because KataLeuna did not purchase CMP's inventory of other zeolites, CMP retained the right to sell that inventory. These facts were disclosed and agreed to by KataLeuna. Albers, Jr. Declaration at § 6.

Albers, Jr. fails to provide any support for this self-serving conclusion, nor does Albers, Jr. identify who disclosed these facts to KataLeuna or how he became aware that KataLeuna agreed with this assess-

ment. Therefore, these sentences of paragraph 6 are stricken.

(iv)

I shall turn at last to an analysis of the motion for summary judgment. I will first consider the misappropriation claims and then the breach of contract claims.

*Misappropriation of Trade Secrets*

■ The Maryland Uniform Trade Secrets Act ("the Act"), Md.Code Ann ., Com.L. Art. § 11–1201(e) *et seq.,* defines a "trade secret" as "information, including a formula, pattern, compilation, program, device, method, technique or process, that: (1) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." *Id.* at § 11–1201(e) (2000); *see also Optic Graphics v. Agee,* 87 Md.App., 770, 783–84, 591 A.2d 578 (1991), *cert. denied,* 324 Md. 658, 598 A.2d 465 (1991). Courts often cite six factors in determining whether given information constitutes a trade secret:

> (1) the extent to which the information is known outside the business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Optic Graphics,* 591 A.2d at 585 *(citing Restatement (First) of Torts* § 757 cmt. b.). In setting forth its *prima facie* case, the plaintiff must produce some evidence that the information at issue meets the

definition of a trade secret. *Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655, 661 (4th Cir.1993). And, the plaintiff must produce evidence that it took reasonable measures to ensure the secrecy of their information. *Id.* at 664.

 Here, CMP argues that KataLeuna, TCP and Tricat have misappropriated CMP's trade secrets, namely the Technology. However, CMP has failed to generate any evidence demonstrating that the Technology qualifies as a trade secret under the Act. Nor has CMP provided any detail or description of what it claims to be trade secrets.[23] Without sufficient detail, I am unable to determine whether specific technology concerns trade secrets. Although it was not necessary for CMP to disclose all of the details of its trade secrets, it had to do more than merely note that the Technology involved trade secrets. *Trandes*, 996 F.2d at 661. Without such evidence, no reasonable jury could find that the Technology was not generally known or readily ascertainable by proper means. Nor could a reasonable jury conclude that the Technology derives independent economic value from its secrecy.

Defendants further argue that the CMP's misappropriation claims fail because CMP chose not to keep the Technology a secret, thus failing the second element of a trade secret. § 11–1201(e)(2).

Under the Act, a misappropriation occurs when one acquires secret information by improper means or discloses the secret information without express or implied consent by a person who used improper means to acquire the information. § 11–1201(c). Again, CMP utterly fails to meet its burden to demonstrate that it took any steps to maintain the secrecy of the Technology.[24] None of the agreements restrict KataLeuna from disclosing the information. In fact, the R & D Agreement only requires CMP, the research organization, to maintain secrecy and confidentiality. No similar restriction is placed on KataLeuna. Because CMP has failed to demonstrate that CMP took any reasonable steps to ensure the secrecy of the technology, CMP cannot claim this information as trade secrets under the Act.

 In addition, not only has CMP failed to demonstrate that it took reasonable steps to maintain the secrecy of the technology, CMP has also failed to establish that any defendant misappropriated the Technology. Proving misappropriation of secret information would require CMP to show that defendants used improper means to acquire from CMP information currently in the defendants' possession or that the information was improperly disclosed to others. *See* § 11–1201(b). The

---

**23.** CMP's entire argument that the Technology consists of trade secrets is as follows: "Defendants' conclusory assertion do [sic] not require any response, but CMP notes that very valuable trade secrets are involved...." Pl.'s Opp. to Defs.' Mot. for Summ.J. at 22.

**24.** CMP's argument is as follows:
Defendants do not suggest how this ultimate "fact" question of what is "reasonable under the circumstances" can be resolved in the present setting without submitting all of pertinent "disputed" underlying material facts to the jury. Thus, it appears defendants' argument is simply ill conceived for summary judgment purposes because the

underlying disputed fact questions inherently will need to be submitted to the jury to be resolved. Pl.'s Opp. to Def.'s Mot. for Summ.J. at 20.
CMP also relies upon the May 1995 Non-Disclosure agreement to demonstrate that it took reasonable steps to maintain the secrecy of the FCC additives technology. As discussed in section (iii), *supra* at 533, I barred CMP from relying on this document because it lacked relevance and was not properly disclosed during discovery. CMP also attempted to rely upon alleged oral representations; however, these statements were stricken as well.

entirety of CMP's misappropriation claim hinges upon its allegation that KataLeuna transferred the Technology to Tricat and TCP. Completely absent, however, is any evidence that the alleged transfer was improper. The record clearly shows that CMP voluntarily transferred its "entire right, title and interest in and to the Technology, including without limitation the right to make, use and sell the same anywhere in the world. . . ." Technology Transfer Agreement at § 3. Thus, I shall grant defendants' motion for summary judgment on counts V, VIII and XII of the Amended Complaint.[25]

## Breach of Contract

CMP claims that KataLeuna has defaulted on the Sales Agency Agreement by failing to make six months worth of payments of $20,000 dollars per month ($120,000 dollars).[26] There is no dispute that

25. Defendants also argue that CMP lacks standing to bring this claim. Specifically, defendants question whether CMP retains any interest in the Technology. Although unclear from its briefs, CMP appears to argue that it retains an interest in the Technology simply because it has retained its knowledge in the Technology. For support, CMP cites the recent Fourth Circuit case which explains circumstances surrounding the ownership of a trade secret. *DTM Research L.L.C. v. AT & T Corp.*, 245 F.3d 327, 332 (4th Cir.2001):

> While the information forming the basis of a trade secret can be transferred, as with personal property, its continuing secrecy provides the value, and any general disclosure destroys the value. As a consequence one owns the trade secret when one knows of it, as long as it remains a secret. Thus, one who possess non-disclosed knowledge may demand remedies as provided by the Act against those who misappropriate the knowledge.

*Id.* (internal quotation marks omitted).

The Supreme Court has observed, however, that the disclosure of a trade secret "to others who are under no obligation to protect the confidentiality of the information" extinguishes the property right. *Motor City Bagels, L.L.C. v. American Bagel Co.*, 50 F.Supp.2d 460, 480 (D.Md.1999) (internal citations omitted) (quoting *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984)). Here, because CMP sold the Technology to KataLeuna without exacting any agreement from KataLeuna to maintain the confidentiality of the Technology, CMP's property right has been extinguished and CMP has lost any standing to assert this claim. *Compare with J & K Computer Sys., Inc. v. Parrish*, 642 P.2d 732, 735 (Utah 1982) (where distributed computer programs contained notices that the programs were for use by authorized licensees only, secrecy of program was not extinguished).

26. Under the Sales Agency Agreement, CMP was to provide sales and marketing services for molecular sieves produced by KataLeuna. In exchange, KataLeuna agreed to pay CMP $20,000 a month for expenses incurred by CMP for its services. The amount which CMP seeks is for six months of expenses.

Specifically under the Sales Agency Agreement, CMP served as the North American sales and marketing agent for molecular sieves ("zeolites") produced by KataLeuna. CMP agreed to "solely and exclusively sell and market those grades of zeolites produced by KataLeuna." Sales Agency Agreement at § 1.1. CMP also agreed that it would "not sell or offer for sale any zeolites produced by other manufacturers." *Id.*

KataLeuna agreed to pay CMP $240,000 annually to support actual sales and marketing expenses for a period of three years. These annual payments were paid in equal monthly installments of $20,000. *Id.* at ¶¶ 1.7 & 5.1. KataLeuna, however, "reserve[d] the right to require proof that these funds were spent appropriately." *Id.* at ¶¶ 1.7. The agreement also included a termination provision which allowed either party to terminate the agreement upon 90 days written notice. ¶ 5.4.

As part of the agreement, CMP agreed to provide a range of services related to the sales and marketing of KataLeuna's zeolites, including a "sales staff, advertising, and brochures." *Id.* at ¶ 1.6. In addition to marketing the zeolites, CMP also agreed to perform a number of services such as providing technical service to customers, handling logistics

KataLeuna is in default with respect to payments that it owed to CMP. KataLeuna contends, however, that its failure was justified or excused because CMP had failed to comply with specific contractual dictates contained within the Sales Agency Agreement.[27]

In Maryland, the burden of showing such justification or excuse is on the party who is defending his breach. *Speed v. Bailey*, 153 Md. 655, 139 A. 534 (1927); *Evergreen Amusement Corp. v. Milstead*, 206 Md. 610, 621, 112 A.2d 901, 906 (1955); *Rhoads v. Nasco*, 242 Md. 723, 724, 219 A.2d 387 388 (Md.1966); *Gamble v. Woodlea Construction Co.*, 246 Md. 260, 228 A.2d 243 (1967); *Foster–Porter Enters. v. De Mare*, 198 Md. 20, 81 A.2d 325 (1951). In *Foster–Porter*, a manufacturer defended his termination of a distributorship agreement by alleging that the seller had breached the agreement by failing to make sales. 198 Md. 20, 81 A.2d 325. The Court of Appeals stated that the burden of proof was on the defendant manufacturer to prove a material breach of the agreement sufficient to justify termination. *Id.* at 29, 81 A.2d at 330; *see also Tricat Industries, Inc. v. Harper*, 131 Md.App. 89, 119, 748 A.2d 48, 64 (2000).

While KataLeuna has offered some evidence that CMP may have breached the agreement, KataLeuna has failed to meet its burden of establishing as a matter of law that CMP breached the agreement. Therefore, I will deny KataLeuna's request for summary judgment as to Count II (KataLeuna's Breach of the Sales Agency Agreement) of CMP's Amended Complaint.

In addition, because genuine issues of fact remain relating to issues surrounding the Sales Agency Agreement, defendants's motion for summary judgment on Counts III and X of its counterclaim will be denied. CMP does admit, however, that it failed to remit proceeds from sales under the Sales Agency Agreement totaling at least $18,507.40. Pl.'s Opp. to Defs.' Mot for Summ.J. at 26–27; Pl.'s Surreply at 26 n. 32; Albers' Dep. at 281, 299. Therefore, because there are no issues in genuine dispute as to count IX of defendants' Amended Counterclaim, I will grant KataLeuna's motion for summary judgment.

CMP contends that KataLeuna breached the Technology Transfer Agreement by its alleged failure to tender "Supplemental Payments."[28] In addition, CMP advances the argument that KataLeuna's failure to seek CMP's consent before attempting to assign the Technology to TCP constituted a material breach and that CMP's alleged transfer of the benefits of the Agreement without transferring the liabilities constituted a material breach.[29] CMP also con-

---

and inventory management, paying license fees, furnishing all necessary equipment, and any other special services needed on specific per customer basis. *Id.* CMP also agreed to collect on behalf of KataLeuna all bills and accounts, "and to immediately pay KataLeuna any amount collected within 20 days...." *Id.* at ¶ 1.5.

27. KataLeuna argues that CMP materially breached the provisions of the agreement by: (1) CMP's alleged failure to provide or maintain an itemized accounting to KataLeuna; (2) CMP's alleged failure to sell exclusively zeolites manufactured by KataLeuna; and (3) CMP's failure to remit proceeds of zeolite

sales to KataLeuna. Defs.' Mem. in Support of Mot. for Partial Summ.J. at 33–34.

28. The Technology Transfer Agreement entitled CMP to "Supplemental Payments" from KataLeuna. "Supplemental Payments" were to be calculated based upon the "Gross Margins" for sales of FCC additives manufactured and sold by KataLeuna after September 1, 1997. Technology Transfer Agreement at ¶ 2(b) and (c). This agreement was binding on the parties as well as their respective successors and assigns. *Id.* at ¶ 16.

29. CMP also argued that KataLeuna materially breached the Technology Transfer Agree-

tends that Tricat and/or TCP are successors or assignees of the Technology Transfer Agreement and as such are consequently liable for any alleged breach of the Technology Transfer Agreement.

Despite CMP's allegations, CMP has failed to establish that the Technology ever generated a "Gross Margin" requiring the payment of "Supplemental Payments." Although TCP made several sales utilizing the Technology Agreement after September 1, 1997, it never achieved a "Gross Margin." Goerlitz Dec. at ¶ 4. CMP proffers no evidence to the contrary. Indeed, CMP does not even appear to dispute this fact. Therefore, CMP has failed to establish that any of the defendants breached the contract by failing to make "Supplemental Payments."

■ CMP has also failed to establish that any of the defendants breached the contract by failing to seek its consent before assigning the technology or attempting to assign the technology. All parties appear to agree that at some point in 1997, KataLeuna assigned or attempted to assign the Technology to TCP.[30] The Technology Transfer Agreement does not require KataLeuna to obtain such consent, nor does the Technology Transfer Agreement restrict KataLeuna from transferring or assigning the Technology.[31] Consequently, CMP has failed to establish any

breach occurred by failing to obtain CMP's consent.

CMP's final argument seeking to impose liability on the defendants concerning an alleged breach of the Technology Transfer Agreement also fails. CMP asserts that a breach of the agreement occurred when KataLeuna transferred the technology to TCP without simultaneously transferring the obligations under the Technology Transfer Agreement. Not surprisingly, CMP has failed to cite any legal authority supporting its theory that one cannot assign rights under a contract unless the obligations are also assigned. Maryland law is clear that parties to an agreement can assign the benefits which flow from the agreement without also assigning the liabilities. *See, e.g., Pumphrey v. Kehoe,* 261 Md. 496, 506, 276 A.2d 194, 200 (1971).

Because CMP has failed to establish a breach of the Technology Transfer Agreement, Count IV of the Amended Complaint will be dismissed. Likewise, CMP's claims against Tricat and TCP for breach of the Technology Transfer Agreement, namely counts VII and XI will also be dismissed.[32]

CMP contends in Count X of the Amended Complaint that Tricat is liable for KataLeuna's alleged breaches. CMP argues that Tricat dominated and controlled KataLeuna and cites the fact that Tricat held an approximately 75 percent interest in KataLeuna from 1995 through

---

ment when it unilaterally terminated the Technology Transfer Agreement on January 1, 1997. CMP, however, has failed to establish through any admissible evidence that KataLeuna unilaterally terminated the agreement or that CMP is owed any damages under the contract.

**30.** Originally, KataLeuna attempted to transfer the CMP Agreements to TCP under an April 1997 Agreement. TCP, however, retroactively transferred the CMP Agreements bach to KataLeuna nullifying any possibility of an assignment. Griessbach Dec. ¶ 8–13.

**31.** *See supra,* pages 530-31 n. 17.

**32.** Even assuming, *arguendo,* that CMP could have established a breach, the fact that CMP failed to establish that it was owed any "Supplemental Payments" would prohibit CMP from recovering the $7.6 million in damages which it is now claiming. In Maryland, "a party suffering a breach of contract is entitled to recover damages in the amount that would place him in the position he would have been in had the contract not been broken." *Johnson v. Oroweat Foods Co.,* 785 F.2d 503, 506 (4th Cir.1986).

early 1997. CMP also urges the court to ignore the corporate boundaries because it alleges that Tricat and Maher transferred money around the various Tricat companies. Amend.Compl. ¶¶ 80–82. CMP rests its assertions solely upon the inadmissible audit report prepared for the BvS by Schitag, Earnst & Young, and deposition testimony by KataLeuna's corporate designee regarding the status of ownership of zeolites stored on CMP's premises.

 Under Maryland law, a corporate veil will be pierced only in the unusual case "where it is necessary to prevent a fraud or enforce a paramount inequity." *Bart Arconti & Sons, Inc. v. Ames–Ennis, Inc.*, 275 Md. 295, 310, 340 A.2d 225, 234 (1975); *Dixon v. Process Corp.*, 38 Md. App. 644, 654, 382 A.2d 893, 899 (1978). The existence of fraud or paramount inequity must be established by clear and convincing evidence. *Dixon*, 382 A.2d at 900.

Here, CMP has failed to meet the high burden to pierce the corporate veil of KataLeuna. CMP has completely neglected to offer any support for its position and has failed to demonstrate the existence of fraud or a paramount inequity. CMP's unsubstantiated allegations that Tricat dominated and controlled KataLeuna and "shuffled" money around the various Tricat affiliates lacks any probative force. Therefore, I will deny CMP's request to ignore Tricat's corporate boundaries.

(v)

For the reasons stated above, defendants' Motion to Strike paragraphs 2–5, 9, 10, 11, 13–15, 17–20, 21–35 and Exhs. 2, 5, 12, 13 of the Richter Declaration will be granted. Defendants' Motion to Strike paragraphs 12, 13, 28, 31, 38, 44, 54, 56, 59–68 of the Albers Declaration, and paragraphs 3, 4, 5 and 6 (second and third sentences) will be granted. Furthermore, defendants' motion for summary judgment with regard to counts II, IV, V, VII, VIII,

XI, and XII of the Amended Complaint will be granted. Defendants' motion for summary judgment shall also be granted with respect to count IX of its counterclaim. Defendants' motion for summary judgment shall be denied as to count X of CMP's Amended Complaint.

### ORDER

In accordance with the foregoing Memorandum, it is this 18th day of September, 2001, by the United States District Court for the District of Maryland, ORDERED

(1) The defendants' motion to strike is GRANTED IN PART AND DENIED IN PART; and it is further ORDERED

(2) The defendants' motion for partial summary judgment is GRANTED IN PART AND DENIED IN PART; and it is further ORDERED

(3) The plaintiff's motion to file a surreply is GRANTED; and it is further ORDERED

(4) The Clerk shall TRANSMIT copies of this Order and foregoing Memorandum to all counsel.